In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3978

Kristin Beul, et al.,

Plaintiffs-Appellees,

v.

ASSE International, Inc., et al.,

Defendants-Appellants,


Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98-C-426--Myron L. Gordon, Judge.


Argued September 7, 2000--Decided November 15,
2000


  Before Bauer, Posner, and Evans, Circuit
Judges.

  Posner, Circuit Judge.  In this diversity
suit for negligence, governed (so far as
the substantive issues are concerned) by
Wisconsin law, the jury returned a
verdict finding that plaintiff Kristin
Beul's damages were $1,100,000 and that
she was 41 percent responsible for them;
in accordance with the verdict, judgment
was entered against defendant ASSE
International for $649,000 (59 percent of
$1.1 million). The other parties can be
ignored. The appeal raises issues of both
tort law and civil procedure.

  The defendant is a nonprofit corporation
that operates international student
exchange programs. For a fee of $2,000 it
placed Kristin, a 16-year-old German girl
who wanted to spend a year in the United
States, with the Bruce family of Fort
Atkinson, Wisconsin. The family, which
consisted of Richard Bruce, age 40, his
wife, and their 13-year-old daughter, had
been selected by Marianne Breber, the
defendant's Area Representative in the
part of the state that includes Fort
Atkinson. Breber is described in the
briefs as a "volunteer," not an employee;

the only payment she receives from ASSE is reimbursement of her expenses. Nothing in the appeal, however, turns either on her "volunteer" status or on ASSE's nonprofit status. Charities are not immune from tort liability in Wisconsin, Kojis v. Doctors Hospital, 107 N.W.2d 131 (Wis. 1961), and ASSE does not deny that if Breber was negligent it is liable for her negligence under the doctrine of respondeat superior, even though she was not an employee of ASSE. The doctrine is nowadays usually described as making an employer liable for the torts of his employees committed within the scope of their employment, but strictly speaking the liability is that of a "master" for the torts of his "servant" and it extends to situations in which the servant is not an employee, provided that he is acting in a similar role, albeit as a volunteer. E.g., Heims v. Hanke, 93 N.W.2d 455, 457–58 (Wis. 1958), overruled on other grounds by Butzow v. Wausau Memorial Hospital, 187 N.W.2d 349, 353-54 (Wis. 1971); Morgan v. Veterans of Foreign Wars, 565 N.E.2d 73, 77 (Ill. App. 1990); Restatement (Second) of Agency sec. 225 (1958). In Morgan, as in this case, the defendant was a charity.

There is also no argument that the contract between ASSE and Kristin's parents is the exclusive source of ASSE's legal duties to Kristin. Negligence in the performance of a contract that foreseeably results in personal injury, including as here emotional distress, is actionable under tort law. See, e.g., Kuehn v. Childrens Hospital, 119 F.3d 1296 (7th Cir. 1997). As we pointed out in Rardin v. T & D Machine Handling, Inc., 890 F.2d 24, 29 (7th Cir. 1989), "tort law is a field largely shaped by the special considerations involved in personal-injury cases, as contract law is not. Tort doctrines are, therefore, prima facie more suitable for the governance of such cases than contract doctrines are" even when victim and injurer are linked by contract. See also Fireman's Fund American Ins. Cos. v. Burns Electronic Security Services, Inc., 417 N.E.2d 131, 134 (Ill. App. 1980).

As the sponsor of a foreign exchange student, ASSE was subject to regulations of the United States Information Agency that require sponsors to train their agents, "monitor the progress and welfare

of the exchange visit," and require a "regular schedule of personal contact with the student and host family." 22 C.F.R. sec.sec. 514.10(e)(2), 514.25 (d)(1), (4) (now sec.sec. 62.10(e)(2), 62.25(d)(1), (4)). These regulations are intended for the protection of the visitor, see "Exchange Visitor Program," 58 Fed. Reg. 15,180, 15,190 (1993) (statement of USIA accompanying promulgation of 26 C.F.R. sec. 514.25), and the jury was therefore properly instructed, under standard tort principles not challenged by ASSE, that it could consider the violation of them as evidence of negligence. There is no argument that the regulations create a private federal right of suit that would allow the plaintiffs to sue ASSE under the federal-question jurisdiction of the federal courts (and we have found no case suggesting there is such a right), or that Wisconsin is legally obligated to use the regulations to define the duty of care of a sponsor sued under state tort law. (In other words, there is no argument that the federal regulations have preemptive force in state tort litigation.) But the district court was entitled to conclude that a state court would look to the regulations for evidence of the sponsor's duty of care. Courts in tort cases commonly take their cues from statutes or regulations intended to protect the safety of the class to which the tort plaintiff belongs. See, e.g., Bennett v. Larsen Co., 348 N.W.2d 540, 548-49 (Wis. 1984).

ASSE is also a member of a private association of sponsors of foreign exchange students, the Council on Standards for International Educational Travel, which requires members to "maintain thorough, accurate, and continual communication with host families and school authorities." A jury could reasonably consider the Council's statement as additional evidence of the standard of care applicable to sponsors and it could also accept the plaintiff's argument that due care required Breber to try to develop rapport with Kristin so that Kristin would trust and confide in her and so that Breber could pick up any signals of something amiss that Kristin might be embarrassed to mention unless pressed.

Kristin Beul arrived in Wisconsin from

Germany on September 7, 1995, and was met at the airport by Richard Bruce and his daughter. Marianne Breber did not go to the airport to meet Kristin. In fact, apart from a brief orientation meeting at a shopping mall in September with Kristin and one other foreign exchange student, at which Breber gave Kristin her phone number, she didn't meet with Kristin until January 21 of the following year-- under unusual circumstances, as we'll see. She did call the Bruce home a few times during this period and spoke briefly with Kristin once or twice, but she made no effort to make sure that Kristin was alone when they spoke. She would ask in these calls how Kristin was doing and Kristin would reply that everything was fine. Breber did not talk to Mrs. Bruce, who would have told her that she was concerned that her husband seemed to be developing an inappropriate relationship with Kristin.

Kristin had led a sheltered life in Germany. She had had no sexual experiences at all and in fact had had only two dates in her lifetime. On November 17, 1995, Richard Bruce, who weighed almost 300 pounds and who was alone at home at the time except for Kristin, came into the loft area in which she slept and raped her.

This was the start of a protracted sexual relationship. In the months that followed, Bruce frequently would call the high school that Kristin was attending and report her ill. Then, with Mrs. Bruce off at work and the Bruce's daughter at school, Bruce would have sex with Kristin. By February 22, Kristin had been absent 27 days from school. Bruce brandished a gun and told     Kristin that he would kill himself if she told anyone what they were doing together.

Curiously, in January Bruce and Kristin called Marianne Breber and told her that Mrs. Bruce appeared to be jealous of the time that her husband was spending with Kristin. Bruce invited Breber to dinner on January 21. Breber did not meet privately with either Kristin or Mrs. Bruce on that occasion, and she observed nothing untoward. In February, however, Mrs. Bruce told Breber that she and her husband were getting divorced, and Breber forthwith found another host family to take in Kristin. Kristin didn't want to

leave the Bruce home, but on February 22 Breber arrived there with a sheriff's deputy to remove Kristin. The deputy asked Kristin in the presence of Richard Bruce and his daughter whether there was any inappropriate sexual activity between Richard and Kristin, and Kristin answered "no." The same day Breber, upon calling Kristin's school to tell them that Kristin would be out for a few days in connection with her change of residence, learned for the first time of Kristin's many absences.

Kristin lived with Breber for a few days between host families, but Breber didn't use the occasion to inquire about any possible sexual relationship between Kristin and Bruce. Breber told the new host family that Kristin was not to contact Bruce for a month, but she did not tell Bruce not to have any contact with Kristin. They continued to correspond and talk on the phone. Kristin had decided that she was in love with Bruce and considered herself engaged to him.

In April, Mrs. Bruce discovered some of Kristin's love letters and alerted the authorities. A sheriff's deputy interviewed Bruce. The next day Bruce, who had committed a misdemeanor by having sex with a 16 year old, Wis. Stat. sec. 948.09, killed himself, leaving a note expressing fear of jail. It is undisputed that the events culminating in Bruce's suicide inflicted serious psychological harm on Kristin; the jury's assessment of her damages is not claimed to be excessive.

The defendant argues that it was entitled to judgment as a matter of law, or alternatively to a new trial because of trial error. The first argument divides into three: there was insufficient proof of a causal relationship between the defendant's negligence in failing to keep closer tabs on Kristin Beul and her sexual involvement with Bruce culminating in his suicide; Bruce's criminal activity was the sole, or superseding, cause of her harm; and the harm was too "remote" in a legal sense from the defendant's failure of due care to support liability.

Since Kristin was determined to conceal her relationship with Bruce, the defendant argues, no amount of care by

Breber would have warded off the harm that befell Kristin; she would have stonewalled, however pertinacious Breber had been in her questioning. This is conceivable, and if true would let ASSE off the hook; if there was no causal relation between the defendant's negligence and the plaintiff's harm, there was no tort. E.g., Merco Distributing Corp. v. Commercial Police Alarm Co., 267 N.W.2d 652 (Wis. 1978); Vastola v. Connecticut Protective System, Inc., 47 A.2d 844, 845 (Conn. 1946); Guthrie v. American Protection Industries, 206 Cal. Rptr. 834, 836 (Cal. App. 1984).

But it is improbable, and the jury was certainly not required to buy the argument. Suppose Breber had inquired from the school how Kristin was doing--a natural question to ask about a foreigner plunged into an American high school. She would have learned of the numerous absences, would (if minimally alert) have inquired about them from Kristin, and would have learned that Kristin had been "ill" and that Richard Bruce had been home and taken care of her. At that point the secret would have started to unravel.

As for the argument that Bruce's misconduct was so egregious as to let ASSE off the hook, it is true that the doctrine of "superseding cause" can excuse a negligent defendant. Suicide by a sane person, unless clearly foreseeable by the tortfeasor, for example a psychiatrist treating a depressed person, is a traditional example of the operation of the doctrine. E.g., McMahon v. St. Croix Falls School District, 596 N.W.2d 875, 879 (Wis. App. 1999); Wyke v. Polk County School Board, 129 F.3d 560, 574-75 (11th Cir. 1997); Bruzga v. PMR Architects, P.C., 693 A.2d 401 (N.H. 1997); Edwards v. Tardif, 692 A.2d 1266, 1269 (Conn. 1997); W. Page Keeton et al., Prosser and Keeton on the Law of Torts sec. 44, p. 311 (5th ed. 1984). So if Bruce's boss had refused him a raise and Bruce had responded by killing himself, the boss even if somehow negligent in failing to give him the raise would not be considered the legal cause of the death. Or if through the carelessness of the driver a truck spilled a toxic substance and a passerby scraped it up and poisoned his mother-in-law with it, the driver would not be liable to the

mother-in-law's estate; the son-in-law's criminal act would be deemed a superseding cause. See Giebel v. Richards, 591 N.W.2d 901 (Wis. App. 1999); Henry v. Merck & Co., 877 F.2d 1489, 1494-97 (10th Cir. 1989); Rowe v. State Bank of Lombard, 531 N.E.2d 1358, 1368 (Ill. 1988); Shelton v. Board of Regents, 320 N.W.2d 748, 752-53 (Neb. 1982).

Animating the doctrine is the idea that it is unreasonable to make a person liable for such improbable consequences of negligent activity as could hardly figure in his deciding how careful he should be. Cf. Schuster v. Altenberg, 424 N.W.2d 159, 165 (Wis. 1988). The doctrine is not applied, therefore, when the duty of care claimed to have been violated is precisely a duty to protect against ordinarily unforeseeable conduct, as in our earlier example of a psychiatrist treating depression. The existence of the duty presupposes a probable, therefore a foreseeable, consequence of its breach. (All that "foreseeable" means in tort law is probable ex ante, that is, before the injury that is the basis of the tort suit.) Thus a hospital that fails to maintain a careful watch over patients known to be suicidal is not excused by the doctrine of superseding cause from liability for a suicide, e.g., DeMontiney v. Desert Manor Convalescent Center, 695 P.2d 255, 259-60 (Ariz. 1985), any more than a zoo can escape liability for allowing a tiger to escape and maul people on the ground that the tiger is the superseding cause of the mauling. City of Mangum v. Brownlee, 75 P.2d 174 (Okla. 1938); see also Scorza v. Martinez, 683 So. 2d 1115, 1117 (Fla. App. 1996); Behrens v. Bertram Mills Circus, Ltd., [1957] 2 Q.B. 1, 1 All E.R. 583 (1957).

So Kristin's high school would not have been liable for the consequences of Bruce's sexual activity with Kristin even if the school should have reported her frequent absences to Breber; the criminal activities with their bizarre suicide sequel were not foreseeable by the school. But part of ASSE's duty and Breber's function was to protect foreign girls and boys from sexual hanky-panky initiated by members of host families. Especially when a teenage girl is brought to live with strangers in a foreign

country, the risk of inappropriate sexual activity is not so slight that the organization charged by the girl's parents with the safety of their daughter can be excused as a matter of law from making a responsible effort to minimize the risk. See, e.g., Niece v. Elmview Group Home, 929 P.2d 420, 427 (Wash. 1997); R.E. v. Alaska, 878 P.2d 1341, 1346-48 (Alaska 1994); Juarez v. Boy Scouts of America, Inc., 97 Cal. Rptr. 2d 12, 31 (Cal. App. 2000); Phillips v. Deihm, 541 N.W.2d 566, 573 (Mich. App. 1995). Sexual abuse by stepfathers is not uncommon, see, e.g., Diana E.H. Russell, "The Prevalance and Seriousness of Incestuous Abuse: Stepfathers vs. Biological Fathers," 8 Child Abuse & Neglect 15 (1984), and the husband in a host family has an analogous relationship to a teenage visitor living with the family.

It is true (we turn now to the issue of remoteness) that when through the negligence of an alarm company, to which ASSE in its role as protector of foreign students from the sexual attentions of members of host families might perhaps be analogized, a fire or burglary is not averted or controlled in time, the company is generally not liable for the consequences; the consequences are deemed too remote. E.g., Edwards v. Honeywell, Inc., 50 F.3d 484, 491 (7th Cir. 1995); Fireman's Fund American Ins. Cos. v. Burns Electronic Security Services, Inc., supra, 417 N.E.2d at 132-33; cf. Fireman's Fund Ins. Co. v. Morse Signal Devices, 198 Cal. Rptr. 756, 760 (Cal. App. 1984); see also Heitsch v. Hampton, 423 N.W.2d 297, 299 (Mich. App. 1988). There are two related considerations. One is that so many factors outside the alarm company's control determine the likelihood and consequences (whether in property loss or personal injury) of a failure of its alarm to summon prompt aid on a particular occasion that the company is bound to lack the information that it needs to determine what level of care to take to prevent a failure of its system. See, e.g., Guthrie v. American Protection Industries, supra, 206 Cal. Rptr. at 836. This basis of the doctrine is the same as that of the doctrine of superseding cause. A harm is not foreseeable in the contemplation of the law if the injurer lacked the information he needed to determine whether he must use special

care to avert the harm. See, e.g., Lodge v. Arett Sales Corp., 717 A.2d 215, 223 (Conn. 1998). The second point is that the alarm company is not the primary accident avoider but merely a backup, and the principal responsibility for avoiding disaster lies with the victim. See, e.g., Rardin v. T & D Machine Handling, Inc., supra, 890 F.2d at 27; EVRA Corp. v. Swiss Bank Corp., 673 F.2d 951, 957-58 (7th Cir. 1982). The points are related because both involve the difficulty a backup or secondary protector against disaster has in figuring out the consequence of a lapse on its part. Neither point supports ASSE, which was standing in the shoes of the parents of a young girl living in a stranger's home far from her homeland and could reasonably be expected to exercise the kind of care that the parents themselves would exercise if they could to protect their 16-year-old daughter from the sexual pitfalls that lie about a girl of that age in those circumstances. ASSE assumed a primary role in the protection of the girl.

So the plaintiff was entitled to get to the jury, and we turn to the two alleged errors in the procedure at trial. The first concerns the judge's response to a question submitted to him by the jury during its deliberations. To try to discipline the jury's thinking, Wisconsin makes the submission of a special verdict the default rule in all civil cases. Wis. Stat. sec. 805.12(1) and Judicial Council Committee's 1974 Note thereto; see Anderson v. Seelow, 271 N.W. 844, 846 (Wis. 1937). In a negligence case, therefore, the jury will be asked to enter separately on the verdict form the amount of damages and the percentage of the plaintiff's comparative fault and not make the "bottom line" computation, which involves deducting from the amount of damages that amount times the plaintiff's percentage of comparative fault. The fear is that the jury will fill in the bottom line first and then work backwards, failing to give due consideration to the significance of the plaintiff's fault. McGowan v. Story, 234 N.W.2d 325, 329 (Wis. 1975). The question the jury asked the judge in this case was, "What bearing do the negligence factors have on the amounts we may or may not choose to award?" The judge's answer, given after consultation with the lawyers, was that

"the comparison factor, if you find both parties negligent, has a significant impact upon the award that the Court enters. . . . If you answer the comparison question, then it is a problem that's presented to the Court as to . . . how to apply those percentages to the damages." ASSE argues that this answer was inconsistent with the policy of Wisconsin law of keeping the jury from working backwards from the bottom line in completing the rest of the special verdict.

In making this argument ASSE assumes that the federal district court in a diversity case is bound not only by Wisconsin's presumption in favor of the use of special verdicts but also by whatever standard Wisconsin courts use to determine how a judge should respond to a jury's question arising from the use of a special verdict. That is incorrect. Wisconsin's affection for the special verdict is not limited to a particular area of law, which would suggest that it was motivated by a desire to shape substantive policy in that area. Compare Herremans v. Carrera Designs, Inc., 157 F.3d 1118, 1123 (7th Cir. 1998); Harbor Ins. Co. v. Continental Bank Corp., 922 F.2d 357, 364 (7th Cir. 1990). Rules of general applicability and purely managerial character governing the jury, such as the form in which a civil jury is instructed, are quintessentially procedural for purposes of the Erie rule. See, e.g., Odekirk v. Sears Roebuck & Co., 274 F.2d 441, 445 (7th Cir. 1960); Turlington v. Phillips Petroleum Co., 795 F.2d 434, 441 (5th Cir. 1986); Seltzer v. Chesley, 512 F.2d 1030, 1035 (9th Cir. 1975); 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure sec. 2555, p. 432 (1995). They are therefore supplied by federal law in diversity as in all other federal cases.

But supplied by what federal law here? Rule 49(a) of the Federal Rules of Civil Procedure authorizes but does not direct the use of special verdicts, and this is the rule that federal courts are to follow, as the cases hold without exception. E.g., Sadowski v. Bombardier Ltd., 539 F.2d 615, 622 (7th Cir. 1976); Geosearch, Inc. v. Howell Petroleum Corp., 819 F.2d 521, 527 (5th Cir. 1987); Shultz v. Rice, 809 F.2d 643, 650 (10th Cir. 1986); DeEugenio v. Allis-Chalmers

Mfg. Co., 210 F.2d 409, 414-15 (3d Cir. 1954); Lang v. Rogney, 201 F.2d 88, 97 (8th Cir. 1953); 9A Wright & Miller, supra, sec. 2502, pp. 154-55. We think it follows that whether the federal court should try to keep the jury in the dark about the legal effect of the jury's answers to the questions posed to it by the special verdict is also a question of federal law, whether viewed as an interpretation of Rule 49(a) or as the creation of a federal common law of special verdicts to supplement the rule. E.g., Thedorf v. Lipsey, 237 F.2d 190 (7th Cir. 1956); Carvalho v. Raybestos-Manhattan, Inc., 794 F.2d 454, 457 n. 2 (9th Cir. 1986); Lowery v. Clouse, 348 F.2d 252, 260-61 (8th Cir. 1965). Although the cases (particularly in this court) make clear that the judge has no general duty to inform the jury of the legal consequences of its verdict, see, e.g., Freeman v. Chicago Park District, 189 F.3d 613, 616 (7th Cir. 1999), and intimate that in some circumstances the giving of such information might interfere with the jury's appraisal of the facts, e.g., Gullett v. St. Paul Fire & Marine Ins. Co., 446 F.2d 1100, 1105 (7th Cir. 1971), there is no rule against giving the information, Simms v. Village of Albion, 115 F.3d 1098, 1107 (2d Cir. 1997); Lowery v. Clouse, supra, 348 F.2d at 261; 9A Wright & Miller, supra, sec. 2509, p. 198, nor have we found any case in which the giving of it was held to be a reversible error. In fact, we find it difficult to conceive of such a case. As Lowery points out, since the judge could submit to the jury instead of a special verdict a general verdict with special interrogatories, a form of verdict that would reveal to the jury the legal consequences of its specific findings, there is no purpose in forbidding him to do the same thing with a special verdict.

All this is rather to one side of the present case, since in the particular circumstances presented here it is apparent that the judge gave as good an answer to the jury's question as he could have done, and a better answer than saying nothing and leaving the jury confused. Cf. Bollenbach v. United States, 326 U.S. 607, 612-13 (1946); Davis v. Greer, 675 F.2d 141, 145 (7th Cir. 1982); Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 176 (1st Cir. 1998). He made clear in the second part of his

answer that the jurors were not to make the bottom-line computation. Had he said in the first part that their answer to the question of comparative fault would have no or an insignificant impact on the damages award, that might have been an invitation to them not to take it seriously; but he did not do that.

The defendant also complains about the following instruction to the jury: "You're instructed that the law of Wisconsin does not allow a child under the age of 18 to consent to an act of intercourse." This was a reference to the state's statutory rape law, but it was not elaborated further. The jury was instructed to consider the instructions as a whole and another instruction was that it was to consider Kristin's comparative fault. The jury assessed that fault at 41 percent, so obviously it did not think the age-of-consent instruction prevented it from considering Kristin's responsibility for the harm that befell her as a consequence of her sexual relationship with Bruce.

But should the jury have been told what the age of consent is in Wisconsin and, if so, was the information conveyed to the jury in the right way? The answer to the first question is yes. The age of consent fixed by a state represents a legislative judgment about the maturity of girls in matters of sex. Eighteen is a pretty high age of consent by today's standards and of course the law was not fixed by reference to German girls; but it is nonetheless a reminder that teenage children are not considered fully responsible in sexual matters, and this was something relevant to the jury's consideration of Kristin's share of responsibility for the disaster. The criminal law is frequently used to set a standard of care for civil tort cases-- for the general principle, see, e.g., Bennett v. Larsen Co., supra, 348 N.W.2d at 548; Cutsforth v. Kinzua Corp., 517 P.2d 640, 647 (Ore. 1973); Southern Pacific Co. v. Watkins, 435 P.2d 498, 511 (Nev. 1967), and for its application to age of consent see Doe v. Greenville Hospital System, 448 S.E.2d 564, 566 (S.C. App. 1994); cf. Mary M. v. North Lawrence Community School Corp., 131 F.3d 1220, 1227 (7th Cir. 1997)--and that was essentially the use made of it here. It would have been error to instruct the

jury that because Kristin was below the age of consent her comparative fault must be reckoned at zero. That would have given too much force to the criminal statute in this civil case, for the statute cannot be considered a legislative judgment that minors are utterly incapable of avoiding becoming ensnared in sexual relationships. A comparative-fault rule, moreover, requires gradations of victim responsibility that are alien to the normal criminal prohibition. Victim fault is not a defense, either partial or complete, to criminal liability. It is not a defense to a charge of rape that, for example, the victim was dressed provocatively, or drunk, or otherwise careless in the circumstances in which the rape occurred.

It would have been better, though, if the jury had been told how it should take the age of consent into account in their deliberations. It should have been told that in deciding how much responsibility to assign to Kristin for the events that gave rise to the harm for which she was suing, it could consider that the state had made a judgment that girls below the age of 18 should be protected by the criminal law from sexual activity even if they agree to it. As it was, the jury was left to tease out the relation between the age-of-consent instruction and the comparative-fault instruction for itself. But we cannot think that it was other than a harmless error. Indeed, we are surprised that the jury assigned so large a responsibility to this young foreign girl virtually abandoned by the agency that was standing in for her parents. The jury verdict was rather favorable to the defendant than otherwise.

Affirmed.