In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-1935

SUSAN COOPER HOUBEN,

*Plaintiff-Appellant*,

*v.*

TELULAR CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 1489—**Ruben Castillo**, *Judge.*

SUBMITTED JANUARY 9, 2002*—DECIDED NOVEMBER 4, 2002

Before POSNER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Susan Cooper Houben's dispute with her former employer Telular Corporation about commissions it owed her is making its second appearance before this court. The first time, we affirmed a jury's decision to award Houben $98,364 for Telular's

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. See FED. R. APP. P. 34(a)(2).

failure to pay her commissions due under the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/1, *et seq.*, but declined to resolve whether Telular owed additional post-trial statutory penalties under IWPCA for failing to pay the judgment within 15 days after it was docketed. After this court remanded for resolution of that issue, the district court concluded that Telular was not subject to any additional IWPCA penalties and denied Houben's writ of execution, indicating without extensive explanation that "the penalty provisions of the IWPCA do not apply under the circumstances of this case." We agree, although not necessarily for the reasons the district court implied, and we therefore affirm its judgment.

# I

The facts of this case are set out in detail in our prior opinion, *Houben v. Telular Corp.*, 231 F.3d 1066 (7th Cir. 2000). At trial, Houben pursued both state and federal claims. The jury returned a verdict in favor of Telular on the federal claims and in favor of Houben on her state claims under IWPCA on May 18, 1999. The judgment was docketed two days later, on May 20, 1999. (Although there is some confusion in the record about the choice between May 18 and May 20 for the actual date of the judgment, FED. R. CIV. P. 79(a) indicates that it is the date of docketing that counts; we therefore discuss the parties' arguments using May 20 as that date, even though the briefs refer also to May 18.) IWPCA provides that an employer who has been ordered by a court to pay wages due an employee and fails to do so within 15 days is liable for statutory penalties of 1% of the wages per calendar day of delay, with a maximum possible penalty of twice the unpaid wages. See 820 ILCS 115/14(b).

Telular filed a timely motion for judgment as a matter of law or a new trial under Rule 59, which the district court

denied in open court on June 10. At that time Houben for the first time raised the issue of the possible application of § 115/14(b) and asked that Telular post a $350,000 bond to cover the judgment and accruing penalties. Five days later, Telular tendered to Houben a check for $98,364, the full amount of wages awarded by the jury. Houben refused the check, asserting that Telular had failed to make payment within 15 days of the date of judgment as required by IWPCA, and that she was therefore already owed an additional $26,557.28.

Telular then filed a motion for stay of the judgment and approval of a supersedeas bond. On June 22, the district court heard the motion and set the bond at $120,000. The court declined to rule definitively on the applicability of IWPCA's penalty provision but orally stated that, if it did apply, any further accrual of penalties would be stayed.

On November 3, 2000, this court affirmed the jury's verdict. In so doing, we noted that the dispute over the IWPCA penalty provision's applicability remained live, but that this fact did not deprive us of jurisdiction because, like attorneys' fees and postjudgment interest, the right to such a payment depended entirely on postjudgment facts. *Houben*, 231 F.3d at 1071. One week later Telular delivered to Houben a check for the original judgment amount plus statutory interest calculated pursuant to 28 U.S.C. § 1961. Houben accepted this check but refused to execute a satisfaction of judgment form or release Telular's appeal bond. Instead she moved for a writ of execution under Rule 69 requesting that Telular be ordered to pay her an additional $196,728. The district court found the IWPCA penalty provisions inapplicable and therefore denied Houben's motion.

**II**

The central question on this appeal is whether the district court was required to apply the penalty provision of the IWPCA, § 115/14(b), or if the statute was inapplicable for one reason or another. The district court thought that § 115/14(b) did not apply "under the circumstances of this case." It explained that Telular "has promptly complied with all the final rulings which established the amount of plaintiff's disputed wages at both the trial and appellate levels well within the time period provided by IWPCA," and that "[n]othing in the record supports a finding that defendant should be penalized under IWPCA." Houben disputes both of those conclusions in her appeal: first, she claims that the time for Telular's payment began to run on the day the original final judgment was docketed, which was May 20, 1999 (not May 18), and that Telular failed to pay within the required time of that date; second, she argues that the statute does not contain any implicit requirement of bad faith on the part of the defendant and thus it does not matter whether the court thought Telular deserved punishment or not. Telular responds that the Illinois statute cannot be applied in a federal court in any event, because under the doctrine of *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), and subsequent cases, it conflicts with federal statutes and rules governing when a judgment creditor is entitled to demand payment. Secondarily, it argues that the district court correctly ruled that § 115/14(b) was inapplicable according to its own terms.

Although, as we explain below, it is quite clear that Telular would not be liable for additional penalties if the normal rules for the payment of federal judgments apply, the parties dispute whether Telular owes extra penalties under state law. If it does not, then there would be no conflict in any event between federal law and state law, and we would be spared the need to de-

cide which body of law governs. We therefore begin with a closer look at § 115/14(b), which reads as follows:

> Any employer who has been ordered by the Director of Labor or the court to pay wages due an employee and who shall fail to do so within 15 days after such order is entered shall be liable to pay a penalty of 1% per calendar day to the employee for each day of delay in paying such wages to the employee up to an amount equal to twice the sum of unpaid wages due the employee.

Illinois courts have indicated that the purpose of this provision is to ensure that employees who win wage cases receive timely and complete payment of the amounts due without retaliation or foot-dragging by employers. *Doherty v. Kahn*, 682 N.E.2d 163, 173 (Ill. App. Ct. 1997). In order to achieve this goal, the statute adopts a strict definition of what counts as "timely" payment: it means payment within 15 days after the Director of Labor or a court has ordered payment. In this case, Telular offered payment to Houben more than 15 days after the original final judgment was docketed on May 20, 1999. Under Houben's interpretation of the rules, Telular had until June 4 (counting from May 20) to pay her; instead, it tendered payment on June 15, which was 11 days late if the clock began on May 20. Telular had also, however, filed a timely motion on June 1, 1999, for either judgment as a matter of law under FED. R. CIV. P. 50(b) or a new trial under Rule 59; that motion was docketed on June 2. The district court denied that motion in open court on June 10. If June 10 is the date to be used for purposes of § 115/14(b), then Telular's June 15 payment was comfortably within the 15-day period mandated by the statute. At the hearing where the post-trial motions were denied, Houben's counsel stated that the plaintiff was taking the position that the date of judgment governed and that statutory penalties were accruing under the

IWPCA. It is also worth noting that Telular's tender occurred five days after that announcement.

From the brief comment in the district court's order to which we referred earlier, it seems that the court may have believed that the relevant starting point in federal court for the IWPCA was the date on which a timely motion under Rules 50 and 59 was denied. This may be why the court thought that Telular had complied with all final rulings well within the time periods provided by the statute. The date on which timely post-trial motions are resolved is the date on which a federal judgment becomes final for other purposes, most importantly taking an appeal to the proper court of appeals, see 28 U.S.C. § 1291 and FED. R. APP. P. 4, and so this might have seemed the most logical way to interpret the various rules to the district court. It also appears that the court believed that there was an equitable element to the IWPCA penalty scheme.

The latter position, however, has not been endorsed by the Illinois courts. In the only case to address this very issue, the Illinois Appellate Court held that "[t]o assert a claim for interest penalties, all that need be shown is that there is an order for back wages issued . . . by a court and that the amount due has not been paid." *Miller v. Kiefer Specialty Flooring, Inc.*, 739 N.E.2d 982, 989 (Ill. App. Ct. 2000). If the correct reference date was May 20, 1999, then as far as the IWPCA was concerned all Houben had to show was that she did not have the money in hand as of June 4, and the penalties would begin accruing; willfulness or its lack on Telular's part was irrelevant. If this had been an Illinois court, *Miller* also indicates that May 20 was the proper date to use: it squarely states that "an exception, objection, challenge, *postjudgment motion*, or an appeal does not toll the accrual of the statutory interest penalties." *Id.* (emphasis added).

One way or the other, therefore, we must consider an *Erie* issue. If, in a federal court, a federal rule governs the moment at which an "employer . . . has been ordered by . . . the court to pay wages due an employee," then it is possible that the normal federal rule for when a district court judgment is final should apply and we should use June 10 in this case. If, on the other hand, the state court's interpretation of the effect that postjudgment motions have in Illinois state courts (that is, no effect) is so intimately tied up with the IWPCA that a state rule should govern, then May 20 is still the operative date. In that case, we must decide whether Illinois's statutory penalty rule is a rule of substance that the federal court was bound to apply, or if it is a rule regulating procedure that has no effect in federal court.

Although the *Erie* doctrine is a familiar one, it is notorious for the subtle distinctions it requires courts to draw between matters that are "substantive" (a conclusory term that means that state law will be used in cases where the rule of decision is derived from state law) and matters that are "procedural" (a similarly conclusory term that means the law of the forum will apply, and thus the same case will be handled differently depending on whether it is being pursued in a state court or a federal court). It is therefore useful to take a quick look at the development of the doctrine and the approach the current Supreme Court appears to be taking to this central issue of judicial federalism.

*Erie* itself presented a very broad question: whether, for purposes of the Rules of Decision Act, which was part of the First Judiciary Act (Act of Sept. 24, 1789, c. 34, 1 Stat. 92) and is now codified at 28 U.S.C. § 1652, federal courts sitting in diversity or otherwise applying state law as the rule of decision are obliged to follow only positive laws of the state as announced in statutes, or if the idea of "state law" also encompassed state deci-

sional law. The Act itself, at the time *Erie* was decided, read simply:

> The laws of the several states, except where the Constitution, treaties or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply.

*Erie*, 304 U.S. at 71. (Today the reference to "trials at common law" is to "civil actions," but the statute is otherwise unchanged.) In the case of *Swift v. Tyson,* 16 Pet. (41 U.S.) 1 (1842), the Court had opted for the narrower construction of the statute, under which the decisions of courts did not generally have the status of "laws" that had to be followed. The Court overruled *Swift* in *Erie*, noting that the *Swift* doctrine had led to a lack of uniformity between state and federal courts and was dubious from a constitutional standpoint. *Erie*, 304 U.S. at 74-75, 77-78. Thus, *Erie* established the rule that the federal courts were obliged to follow state decisional law, as well as all other state law, in cases governed by the Rules of Decision Act. (While *Erie* questions arise most frequently in diversity cases, the Supreme Court has made clear that the doctrine applies equally to state law claims like Houben's that are brought to the federal courts through supplemental jurisdiction under 28 U.S.C. § 1367. See *Felder v. Casey*, 487 U.S. 131, 151 (1988).)

Questions soon arose over the full reach of the *Erie* ruling, however, because in the very same year that *Erie* was decided, 1938, the Supreme Court promulgated the Federal Rules of Civil Procedure. The new rules replaced the old Conformity Act, which had been enacted in 1789 almost contemporaneously with the First Judiciary Act, see Process Act of 1789, Act of Sept. 29, 1789, c. 21, § 2, 1 Stat. 93. The Conformity Act provided that the

procedure in actions at law in the federal courts was to be the same as the procedure used in the state in which the federal court sat. (Later, in 1842, the Supreme Court issued uniform federal rules for suits in equity, see 42 U.S. (1 How.) Lvi (first edition only), but those rules are not important for present purposes.) Had the Federal Rules not appeared at almost the same moment as the *Erie* decision, life would have been easy for federal courts: both state rules of procedure and the full body of state substantive law would have been applicable, and there would have been no need to worry about categorizing any particular law. But for a variety of reasons, Congress had passed the Rules Enabling Act, the successor to which can be found at 28 U.S.C. § 2072, in 1934. Act of June 19, 1934, c. 651, §§ 1, 2, 48 Stat. 1064. That Act empowered the Supreme Court to unify the systems of law and equity and to issue a single set of civil procedure rules to be used in the federal district courts. The rules that were developed under the authority of the Enabling Act were adopted by the Supreme Court on December 20, 1937, and took effect on September 1, 1938, less than five months after *Erie* was handed down. See generally 19 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE & PROCEDURE, § 4508 (2d ed. 1996).

*Erie* may have solved one problem, and the Rules Enabling Act may have solved another one, but in a small but significant set of cases they combined to create a new one. For cases involving obvious rules of substance (*e.g.*, whether a person walking beside a railroad track is a "trespasser" or an "invitee" under state land law; whether a tort plaintiff's claim is defeated if she was contributorily negligent, or if she loses only if her negligence was more than 50% responsible for the tort; whether the holder in due course rule applies to certain endorsers of commercial paper), it was easy for the federal courts to conclude that they were now to apply state law.

(Ascertaining the content of state law poses its own problems, but we need not consider that aspect of *Erie* here.) For cases involving obvious rules of procedure (*e.g.*, which documents must be served formally and which must be filed with the court, see FED. R. CIV. P. 5; when is the earliest time a motion for summary judgment may be filed, see FED. R. CIV. P. 56(a), (b); what kinds of discovery devices are available, see FED. R. CIV. P. 26-37), federal courts knew that they were required to follow the Federal Rules, even if those rules were different from the rules applicable in state court. But there was a middle ground for rules that might be seen as "substantive," or might be seen as "procedural," and it was difficult both to define what those terms might mean, and to decide the box in which to put different rules.

The Court's first effort to grapple with the middle ground came in *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945), in which it had to decide whether a state statute of limitations barred a claim brought for breach of trust by certain noteholders of a corporation against the trustee, or if the fact that the suit had been brought on the "equity" side of the federal court meant that the state statute of limitations governing "law" actions did not apply. The Court summarized the question before it as follows:

> [W]hether, when no recovery could be had in a State court because the action is barred by the statute of limitations, a federal court in equity can take cognizance of the suit because there is diversity of citizenship between the parties. Is the outlawry, according to State law, of a claim created by the States a matter of "substantive rights" to be respected by a federal court of equity when that court's jurisdiction is dependent on the fact that there is a State-created right, or is such statute of "a mere remedial character," . . . which a federal court may disregard?

326 U.S. at 107-08 (citation omitted). After commenting on the slippery nature of the distinction between substance and procedure, the Court reformulated the question as:

> [W]hether [the statute under review] concerns merely the manner and the means by which a right to recover, as recognized by the State, is enforced, or whether such statutory limitation is a matter of substance in the aspect that alone is relevant to our problem, namely, does it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?

*Id.* at 109. Applying this test, which came to be known as the "outcome-determinative" test, the Court concluded that the state statute of limitations was one of those laws that the federal court was obliged to apply, even if a different rule would have prevailed in a claim arising under federal law.

Not long after *York* was decided, however, the Court came to realize that the outcome-determinative test swept too much under state law. As it observed in *Hanna v. Plumer*, 380 U.S. 460 (1965), in a certain sense

> *every* procedural variation is "outcome-determinative." For example, having brought suit in a federal court, a plaintiff cannot then insist on the right to file subsequent pleadings in accord with the time limits applicable in state courts, even though enforcement of the federal timetable will, if he continues to insist that he must meet only the state time limit, result in determination of the controversy against him.

*Id.* at 468-69 (emphasis in original). Instead, it began to look at the issue in a broader way. Thus, in *Byrd v. Blue Ridge Rural Elec. Coop., Inc.,* 356 U.S. 525 (1958), the Court decided that the "manner in which, in civil common-

law actions, [the federal system] distributes trial functions between judge and jury" is a question governed solely by federal law. *Id.* at 537. As the *Hanna* Court put it, the "'outcome-determination' test . . . cannot be read without reference to the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." 380 U.S. at 468.

*Hanna* went further than this, however. It held that *Erie* was never intended to cover cases where a federal rule of procedure covers the point at issue. In those cases, the proper questions are only (1) whether the rule clearly applies, (2) whether the rule falls within the scope of the Rules Enabling Act, and (3) whether the application of the rule would be constitutional. If the rule applies and is "rationally capable of classification" as procedural, see 380 U.S. at 472, then (in the absence of other constitutional problems, of course) the federal court must apply it.

The Supreme Court has revisited the *Erie* issue many times since those early years, but it is enough for us to look at the Court's two most recent decisions in order to complete our background review. We turn, then, to *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996), and *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001). In *Gasperini*, the Court considered the question whether a New York rule of procedure, NYCPLR § 5501(c), which empowers state appellate courts to review the size of jury verdicts and to order new trials when the award "deviates materially from what would be reasonable compensation," could be applied in federal court consistently with the re-examination clause of the Seventh Amendment to the U.S. Constitution. The case was a diversity action for breach of contract, conversion, and negligence, brought by Gasperini (a journalist) against the Center for Humanities, when it failed to return certain original slides and videotapes he had sent

to the Center. After a trial on damages, the jury awarded Gasperini $450,000 in compensatory damages; the Center attacked the verdict as excessive, but the district court denied its motion. The Court of Appeals for the Second Circuit concluded that it had to apply § 5501(c); after reviewing the verdict, it decided that it was indeed excessive and it vacated the judgment unless Gasperini would agree to a reduced award of $100,000.

The Supreme Court took the case to decide whether, in a case where New York law governed the claims for relief, New York law also supplied the test for federal-court review of the size of the verdict. 518 U.S. at 426. At the outset, it stated that "[t]he dispositive question, therefore, is whether federal courts can give effect to the substantive thrust of § 5501(c) without untoward alteration of the federal scheme for the trial and decision of civil cases." *Id.* The Court then asked whether NYCPLR § 5501(c) was "outcome affective" in the sense that application of its standard would be so significant to one or both of the litigants that failure to apply it would either unfairly discriminate against citizens of the forum state or would be likely to cause the plaintiff to choose federal court. *Id.* at 428. It was common ground among the parties and the Court that if New York had instead enacted a statutory cap on damages, that would have been a "substantive" rule binding on the federal court in a diversity case. But, the Court thought, § 5501(c) was not the equivalent of a damages cap. Nevertheless, it did implicate the "twin aims" of *Erie*. *Id.* at 430.

What the Court did in the end was to find a middle ground. First, it decided that appellate review in the federal system of a trial judge's denial of a motion to set aside a jury verdict as excessive was compatible with the Seventh Amendment. *Id.* at 436. Second, it found a way to accommodate the state and the federal interests,

consistently with the Seventh Amendment's clause forbidding appellate re-examination of jury verdicts other than according to the rules of the common law. It allocated to the district court (not the appellate court, as would have been the case in the state system) the primary duty to apply New York's substantive standard forbidding verdicts that "deviate materially" from a reasonable compensation. The federal courts of appeals could then review the district court's decision under the normal abuse of discretion standard. *Id.* at 438. Thus, at the end of the day the Court found a way to implement the substantive elements of the state statute within the framework of federal procedures.

The *Semtek* decision also involved a delicate balancing of federal and state interests, but as in *Gasperini*, the Court ultimately affirmed the applicability of federal procedures. The question there was "whether the claim-preclusive effect of a federal judgment dismissing a diversity action on statute-of-limitations grounds is determined by the law of the State in which the federal court sits." 531 U.S. at 499. After deciding that neither precedent, nor FED. R. CIV. P. 41(b), nor the Full Faith and Credit Clause of the Constitution, Art. IV, § 1, nor the full faith and credit statute, 28 U.S.C. § 1738, dictated the answer to the question, the Court went back to first principles. It was already established that the effect of a federal court judgment in a federal question case was whatever the Supreme Court prescribed. 531 U.S. at 507. By extension, it then concluded that the Supreme Court had "the last word on the claim-preclusive effect of *all* federal judgments." *Id.* (emphasis in original). "In short, federal common law governs the claim-preclusive effect of a dismissal by a federal court sitting in diversity." *Id.* at 508. It then turned around and decided that for this purpose, the rule of federal common law would be to adopt the claim-preclusion rule of the state where

the federal court was sitting, since there was no particular need for national uniformity in this set of cases. Finally, however, it created an exception to its adoption of state law as the federal rule for "situations in which the state law is incompatible with federal interests." *Id.* at 509. No such incompatibility was present in the case before it, and so it decided to give the federal judgment the same effect a California court would have given an analogous California judgment.

*Gasperini* represents an acknowledgment that some statutes have both substantive and procedural aspects. This court has also encountered this type of problem, in a line of cases that began with a suit in which an arcane rule of contract doctrine called "mend the hold" figured prominently. *Harbor Insur. Co. v. Continental Bank Corp.*, 922 F.2d 357 (7th Cir. 1990), involved the interpretation of an insurance policy for directors' and officers' liability, which Harbor and Allstate had issued to Continental Bank. Harbor and Allstate brought a declaratory judgment action against Continental, after Continental had been sued by a class of investors over its handling of some very bad loans, seeking a declaration that they were not liable under the policies. The reason, they alleged, was because the directors and officers had behaved so egregiously that the insurance companies would be forbidden under federal and state law from indemnifying them. Continental eventually settled the primary lawsuits, and it filed a counterclaim against the insurance companies seeking reimbursement of its litigation expenses and settlement expenses.

At that point, the insurance companies changed their story 180 degrees: they filed a defense to the counterclaim that took the position that Continental should not have settled the claims because the directors and officers had done nothing wrong at all. Under Illinois law, this attempted change in position ran afoul of the "mend the

hold" doctrine, which is a common law rule that limits the right of a party to a contract suit to change positions. *Harbor Ins. Co.*, 922 F.2d at 362. As such, the doctrine is in at least potential tension with the philosophy of the Federal Rules of Civil Procedure, which permit pleadings to be amended well into the litigation, if the district court thinks that amendment would be in the interest of justice. See FED. R. CIV. P. 15. In *Harbor Insurance* itself, the panel did not need to confront this potential conflict, because Continental conceded that if facts developed after the suit was filed justified a change in a contract party's litigating position, such a change would be permissible. As we observed, "By this concession Continental not only eliminates a conflict between the doctrine and the federal rules but also brings the doctrine into closer phase with the good-faith duty of contract parties that . . . suppl[ies] the doctrine's modern rationale . . . ." *Harbor Ins. Co.*, 922 F.2d at 364.

Next was *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118 (7th Cir. 1998), which (much closer to our problem) concerned a suit for breach of contract and violations of Indiana's wage payment statute. The employee, Herremans, had raised a claim for breach of a contract to pay him certain bonuses, which he asserted were to be computed on the basis of his company's annual profits. After deciding that his claim could not proceed on various other grounds, the court turned to his contract theory. He claimed that he had a contractual entitlement to the bonuses, but the district court decided that enforcement of any possible contract was barred by Indiana's statute of frauds. The problem was that the company had not asserted the statute of frauds as an affirmative defense, even though it is expressly listed as such a defense in FED. R. CIV. P. 8(c). That was enough, assuming that the Federal Rules applied, to foreclose Carrera from raising the defense. Citing *Gasperini*, the court went on to state:

> There is an exception for cases in which the applica-
> tion of the federal rule would interfere with substan-
> tial state interests, . . . and the exception is more
> likely to be applicable when the state waiver rule is
> limited to some particular body of substantive law
> and is therefore more likely to reflect state substan-
> tive policies than is a procedural rule of general ap-
> plicability.

*Herremans*, 157 F.3d at 1123. But that exception, exempli-
fied by the "mend the hold" doctrine discussed in *Harbor
Insurance*, did not help Carrera; instead, it was a cumula-
tive reason for ruling that it was too late for Carrera to
change its litigating position and add a statute of frauds
defense.

Another in the same group was *Beul v. ASSE Int'l, Inc.*,
233 F.3d 441 (7th Cir. 2000). This was a diversity suit in
which a young German woman alleged that the defen-
dant ASSE had been negligent in its performance of a
contract under which she came to the United States
and lived as a foreign exchange student with a host fam-
ily in Wisconsin. ASSE had failed to monitor the condi-
tions in the host home; had it done so, the jury found, it
would have discovered that the father had raped the
young woman and had then engaged in a lengthy sexual
relationship with her. The jury ruled for the plaintiff,
and one of the arguments on appeal was that the dis-
trict court failed to follow a Wisconsin rule relating to
the jury's computation of damages. In Wisconsin, as this
court explained, special verdicts are the default rule in
all civil cases, and so the jury must separately indicate
the amount of damages it believes were suffered and the
percentage of the plaintiff's comparative fault. Wiscon-
sin does not want juries working "backwards" from the
amount they want the plaintiff to receive. In this trial, the
jury sent a question out to the judge while it was delib-
erating and asked, "What bearing do the negligence fac-

tors have on the amounts we may or may not choose to award?" *Id.* at 449. The judge responded that "the comparison factor, if you find both parties negligent, has a significant impact upon the award that the Court enters . . . . If you answer the comparison question, then it is a problem that's presented to the Court as to . . . how to apply those percentages to the damages." *Id.* This court rejected ASSE's argument that the federal court was bound by the standard Wisconsin courts should use in answering such a question. We noted:

> Wisconsin's affection for the special verdict is not limited to a particular area of law, which would suggest that it was motivated by a desire to shape substantive policy in that area. . . . Rules of general applicability and purely managerial character governing the jury, such as the form in which a civil jury is instructed, are quintessentially procedural for purposes of the *Erie* doctrine.

*Id.* (citations omitted). Federal law thus governed the propriety of the judge's response, which the court then went on to find was a permissible one.

The problem before us is therefore, in light of the *Erie* doctrine as it has currently evolved, what to do with the two issues presented by this case, namely (1) does federal or state law govern the date on which an order is sufficiently final to trigger the provisions of § 115/14(b), and (2) if the answer to question (1) is state law, then is this a procedural rule that must yield to contrary federal law, or is it the kind of state law with enough of a substantive effect that it must be followed in federal court?

We consider first the question as of what date has the employer "been ordered by . . . the [federal] court to pay wages due an employee." It is no answer to this question to say that the IWPCA embodies a policy of prompt payment of wage claims, because the statute does not im-

pose an obligation of payment on the employer until such an order is firmly in place. As we noted earlier, the Illinois courts regard the initial date of judgment as the operative date, even if a timely post-verdict motion is filed. See *Miller*, 739 N.E.2d at 989. But we see no reason why such a rule should be binding on the federal courts. It seems to us that each court system is entitled to have a consistent rule with respect to the time when the trial court's order is deemed final and triggers an obligation on the losing party to comply immediately. In the federal court system, that is at a minimum 11 days after the date on which the final judgment is docketed. See FED. R. CIV. P. 62(a) ("Except as stated herein, no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 10 days after its entry"). Taking this view, the 15-day period would thus *begin* to run no sooner than the 11th day after judgment. If no post-trial motion is filed under either Rule 50(b) or Rule 59, then execution can proceed immediately thereafter. If such a motion is filed, then under Rule 62(b) the district court has the discretion either to permit a further stay of execution or to allow execution to go forward.

It seems possible to us, in light of the substantive policy Illinois has expressed in the IWPCA in favor of prompt payment of judgments for past wages and in keeping with *Gasperini*'s approach, that state substantive interests and federal procedural rules might be capable of accommodation. This would require us to put together two aspects of Rule 62 as follows: first, the 15-day period provided by the IWPCA would begin to run on the date when execution on a federal judgment is first possible according to Rule 62(a) (the 11th day after the judgment); and second, the district court would be required in this special substantive area (along the lines identified in *Harbor Insurance*) to exercise its discretion

under Rule 62(b) in favor of permitting immediate execution and leaving it to the parties to fight out on post-trial motions and on appeal the question whether or not the initial judgment was correct. If this could be done and was applied to our facts, then (as the district court held) Telular's tender of payment to Houben on June 15 was timely: the judgment was entered on May 20; Rule 62(a) permitted execution no sooner than June 4 (the day after the expiration of the 10-day period to which the rule refers, according to the counting rule specified in Rule 6(a) that excluded weekends and holidays for time periods less than 11 days); and Telular paid on June 15, 11 days later.

There are still problems with this accommodation, as we describe below, because it implies that state law deprives federal judges of discretion that has been conferred on them by valid federal rules. In addition, this approach assumes that the IWPCA is the kind of specialized state law to which we alluded in *Harbor Insurance*, *Herremans*, and *Beul*, but that is not the way the Illinois courts have treated it. To the contrary, the *Miller* decision described § 115/14(b) as a statute that was no different from the other Illinois post-judgment interest statutes. *Miller*, 739 N.E.2d at 989 ("Ordinary postjudgment interest is treated similarly."). Interestingly, Illinois treats its general post-judgment interest statute, 735 ILCS 5/2-1303, in just the same way as it treats § 115/14(b). Both operate automatically as a matter of statutory command. Neither one is tolled by appeals or post-trial motions, and neither inquires into the reasons for the defendant's failure to pay the judgment. The purpose of both, to prevent employers from having an incentive to withhold payment, is identical. It is for Illinois, not this court, to say whether it has a special substantive doctrine, like the one reflected in the "mend the hold" cases (which amounts to a special statute of lim-

itations for certain contract defenses, it seems), or if it has a more general rule. *Miller* indicates that it has not done so with the IWPCA.

If the possible accommodation we have outlined is too much of a strain, we must turn to more general principles to resolve this case. We know from *Hanna v. Plumer* that there is a gray area in which something might rationally be categorized as either procedural or substantive. *Hanna* directs federal courts to evaluate these areas carefully. The first step is to decide whether, when fairly construed, the scope of any federal rule or statute is broad enough either to cause a "direct collision" with the state law or otherwise "control[s] the issue" before the court. *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987). If the state rule is in actual conflict with the federal rule, and the federal rule is "rationally capable of classification" as procedural, then it is the federal rule that must apply unless the federal rule or statute is unconstitutional. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 n.7 (1996) (citing *Hanna*, 380 U.S. at 469-74); see also *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 60 F.3d 305, 310 (7th Cir. 1995).

We think it clear that the federal rule governing the date on which execution may issue upon a judgment (Rule 62) and the mechanisms that exist to ensure prompt payment of judgments are at least rationally capable of classification as procedural. In *DDI Seamless Cylinder Int'l, Inc. v. General Fire Extinguisher Corp.*, 14 F.3d 1163 (7th Cir. 1994), we had this to say about the ten-day automatic stay of execution and post-judgment interest in the context of an unusual decision by the parties to name the magistrate judge as their arbitrator:

> It is unusual, to say the least, for a judge to issue an order directing the payment of a judgment within ten days under threat of sanctions—there is no other

way to describe the "liquidated damages" provision, which so far as appears bears no relation to any reasonable estimate of the cost to DDI of a one day's delay in payment of the judgment—if the judgment is disobeyed. Indeed, in the usual case such an order would be clearly *ultra vires*. Not only is there no statutory authority for it; there is no room for an exercise of inherent judicial power. The ground is occupied by statutes and rules already. A plaintiff who obtains a money judgment is entitled to post-judgment interest, 28 U.S.C. § 1961, at an interest rate . . . much lower than the implicit interest rate (43.8 percent per annum!) reflected in the "liquidated damages" provision imposed by the magistrate judge. And the collectability of a judgment is secured by the requirement that the defendant post a supersedeas bond if he wants to stave off execution pending appeal, Fed. R. Civ. P. 62(d). . . .

14 F.3d at 1167. This analysis suggests strongly that the regime for collection of federal judgments is something fully addressed by positive federal law.

If there is a conflict between Illinois law and federal law, *Hanna* obliges us to follow the federal rule under the circumstances we have here. Construed the way Houben urges us to see it, Illinois' penalty provision conflicts with the two federal laws identified in *DDI*: 28 U.S.C. § 1961 and FED. R. CIV. P. 62. As we noted there, Congress has enacted a post-judgment interest statute for use in the federal courts, which is found at 28 U.S.C. § 1961. That statute sets interest at a rate equal to the weekly average 1-year constant maturity Treasury yield. At the time of judgment, this was equivalent to 4.727% per year, a fraction of the 1% per day interest payment IWPCA mandates. Because Congress has already established a rule for interest in federal cases designed to ensure the prompt payment of judgments by recalcitrant defen-

dants, the purposes underlying the statute are "sufficiently coextensive with the asserted purposes of the [Illinois] statute to indicate that [§ 1961] occupies the statute's field of operation so as to preclude its application" here. *Burlington N. R.R.*, 480 U.S. at 7.

Furthermore, the Illinois statute as Houben wants it applied also directly collides with Rule 62 of the Federal Rules of Civil Procedure. As we have already noted, that rule imposes an automatic stay preventing execution of the judgment until the expiration of 10 days after entry of a judgment. That in itself may not be enough to create a direct collision, because it would still leave five days for payment after the grace period is over. But Rule 62(b) permits the district court to issue a further stay of execution during the pendency of a timely filed motion for new trial under Rule 59 or a motion for judgment as a matter of law under Rule 50. According to Houben, the Illinois statute withdraws that discretion from the federal judge. Finally, once an appeal is taken (which cannot occur until after the disposition of the Rule 50/59 motions), the court may continue the stay of execution if the appellant files a supersedeas bond during the pendency of any appeal. FED. R. CIV. P. 62(d). The IWPCA penalty provision gives the trial court none of the flexibility assured by Rule 62(b) and (d); the judgment must be paid or else the penalties (like the "liquidated damages" in *DDI*) automatically accrue. *Cf. Burlington N. R.R.*, 480 U.S. at 6-7 (finding mandatory post-judgment appeal penalty preempted by federal rule granting trial court discretion in selecting a sanction). The state procedure is thus in "direct collision" with the federal procedure established by Congress, and under *Walker v. Armco Steel Corp.*, 446 U.S. 740, 750 n.9 (1980), the federal rule of procedure must prevail. Under the federal procedure, both parties should be indifferent from an economic standpoint about the timing of payment, because when a stay of execution has been entered,

the status quo (*i.e.*, the real value of the judgment) is maintained through use of a Treasury-tied interest rate. *Illinois Bell Tel. Co. v. Worldcom Techs.*, 157 F.3d 500, 502 (7th Cir. 1998). Since there is no argument that either § 1961 or Rule 62 is unconstitutional, the district court correctly decided to apply the federal rules, not the conflicting state rule.

### III

Because IWPCA § 115/14(b) is, for purposes of the *Erie* doctrine, either capable of accommodation on these facts with the federal rules governing the date on which execution may begin on a federal judgment, or if not, is in direct conflict with valid federal rules of procedure, we conclude that the district court was correct to deny Houben additional penalties. Its judgment is therefore AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*