# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2990-21

B.B.,

    Plaintiff-Appellant,

v.

S. BRADLEY MELL, KIMBERLY
RUGGLES MELL, individually, and as
guardian of W.M., W.H. MELL
ASSOCIATES, INC., GULFSTREAM CM,
LLC, GULFSTREAM GM, LLC, AERO
CARE SERVICES, LLC, EMILY MELL,
ELIZA MELL, STEVEN BRADLEY
MELL 2012 FAMILY TRUST, KIMBERLY
MELL 2012 FAMILY TRUST, and
MOUNTAINSIDE SECURITIES, LLC,

    Defendants-Respondents.

_____

Argued November 10, 2022 – Decided December 31, 2024

Before Judges Accurso, Firko and Natali (Judge Natali concurring).

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-7200-19.

Bruce H. Nagel argued the cause for appellant (Nagel Rice, LLP, attorneys; Bruce H. Nagel, Diane E. Sammons and Michael J. Paragano, of counsel and on the brief).

Patrick J. Whalen argued the cause for respondents Kimberly Ruggles Mell and Steven Bradley Mell 2012 Family Trust.

David M. Dugan argued the cause for respondent Kimberly Ruggles Mell 2012 Family Trust (Chiesa Shahinian & Giantomasi PC, attorneys; A. Ross Pearlson and David M. Dugan, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

This appeal is here on our leave to resolve whether a plaintiff, eighteen years old when she filed her complaint, and who is suing to recover damages for injuries resulting from child sexual abuse can block defendants, including the abuser, from questioning her at deposition regarding the sexual acts she alleges in her complaint that occurred before the age in which she could legally consent under the State's criminal law.

Recognizing that very little discovery has been conducted in this matter to date, we hold that facts relating to plaintiff's participation in the sexual acts she alleges in her factually-detailed complaint are material and relevant to damages in this civil action in which she seeks actual, not statutory, damages

2

for child sexual abuse under N.J.S.A. 2A:61B-1(h), as well as to liability and damages on her common law claims and to various defenses pled by defendants, particularly those other than the abuser, and thus pre-trial discovery on those issues is permissible in accordance with our Supreme Court's commitment to broad discovery under Rule 4:10-2.

Plaintiff B.B, now twenty-three years old, had engaged in sex acts for roughly two months before her sixteenth birthday and three to four months after with then fifty-one-year-old "wealthy businessman" defendant S. Bradley Mell,[1] a married father of three. B.B.'s "relationship" with Mell ended in December 2017 when a friend of B.B.'s learned of the abuse and reported it to a teacher, who reported it to police. Mell was arrested in May 2018. He subsequently pleaded guilty in federal court to receipt of child pornography, 18 U.S.C. § 225A(a)(2), and travel with the intent to engage in illicit sexual conduct, 18 U.S.C. § 2423(b), and in state court to third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1). He is serving a seven-year federal sentence in a prison in Pennsylvania, concurrent with his three-year state sentence.

---

[1] As B.B. refers to him in her complaint.

A-2990-21

Following Mell's sentencing in 2019, B.B. instituted this civil suit for damages. In a factually detailed complaint, B.B. alleged Mell began "grooming" her around the time of her fourteenth birthday in the summer of 2015. During that summer, B.B. suffered a serious boating accident in Nantucket requiring her hospitalization. "Mell had his pilot fly [Mell's] plane to Martha's Vineyard" to bring B.B. home to New Jersey.

The following summer, B.B. claimed Mell, "a licensed pilot who operated businesses that owned multiple planes and helicopters," took her and members of her family on flights to Nantucket and Maine. The flights continued into the fall of 2016, including a helicopter ride around New York City in which B.B. was joined by her mother and older sister. Later that fall, Mell flew both his and B.B.'s families to Maine to visit Mell's daughter and B.B.'s sister at their college. Following another family flight to Maine in the spring of 2017 to visit B.B.'s sister on her birthday, B.B. claimed she and Mell began communicating via Snapchat, contact he initiated. The two thereafter "began following each other on Instagram and subsequently became Facebook friends."

According to the complaint, Mell texted B.B. in May, "offering her a ride home," which she refused. Several days later, Mell sent plaintiff "a text

4

message offering her his unsolicited views about the behavior of boys of her age." B.B. claimed "these overtures led to Mell inappropriately asking [her] about her sexual experience," including questions about "whether she had an interest in doing more than just kissing boys and whether she would do specific things, like oral sex. He offered to educate her so she could be ready and know what to do." Later that same month, B.B. claimed Mell took her for a ride in his helicopter alone for the first time.

In her complaint, B.B. claimed she had "held a long-term desire to learn to fly and in, or about June 3, 2017, Mell took [her] to sign up for flying lessons," which he paid for. While flying her to Princeton two days later, Mell "expressed a specific desire to 'kiss' her, but she refused." Plaintiff claimed Mel first touched her inappropriately a few weeks later by placing his hand on her leg "in a sexual manner" after the two went for a swim in her family's pool before Mell flew them to New York City to pick up B.B.'s mother and sister.

According to the complaint, B.B. "slept over [at] Mell's house on several occasions between June 20, 2017, and July 5, 2017." On June 20, 2017, while Mell's family was away in Nantucket, Mell "grabbed and groped B.B. and tried to perform oral sex on her . . . touching [her] leg and moving his hands upward." B.B. claimed that "[l]ater that night, he performed oral sex on her."

5

She claimed the first act of sexual intercourse occurred on July 5, 2017. B.B. claimed "she was upset" afterwards, referring to the encounter "as 'what he did to her'" while Mell "would insist the act was mutual."

In her complaint, B.B. alleges she and Mell "had at least 34 sexual encounters," between June 20, 2017, and November 17, 2017, including at B.B.'s home, Mell's homes in New Jersey and Nantucket, his offices in Summit, the Morristown airport, three hotels in New Jersey and one in New York City and "in a plane cabin while the plane was on autopilot" during a flight from New Jersey to Cape Cod. The complaint alleges B.B. and Mell exchanged naked photographs of themselves via iMessage, that B.B. "took a picture of herself and Mell in bed together," and that "Mell convinced [her] to engage in FaceTime chats while they were both in the shower at their respective locations."

B.B. alleges "Mell devised an elaborate plan to keep their relationship from others by enlisting the aid of B.B.'s best friend." Mell told B.B. to leave her cell phone with her friend when she and Mell were together. Thus, if B.B.'s mother was attempting to track her whereabouts through her phone, she would believe B.B. was at her friend's house. If B.B.'s mother called looking

6

for her, the friend could alert B.B. by calling another cell phone Mell had provided B.B. for that purpose.

As to Mell, B.B.'s complaint alleges violations of the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1; and the statute permitting recovery for child exploitation, N.J.S.A. 2A:30B-3; assault and battery; intentional infliction of emotional distress; negligent infliction of emotional distress; false imprisonment; invasion of privacy; and invasion of privacy under N.J.S.A. 2A:58D-1. She seeks compensatory and punitive damages, and costs of suit, including reasonable attorney's fees.

B.B. also named several businesses Mell formerly operated or was affiliated with, W.H. Mell Associates, Inc., Gulfstream CM, LLC, Gulfstream GM, LLC, and Aero Care Services, LLC, alleging each knew or should have known that Mell's tortious acts against B.B. took place in facilities they either owned or operated. B.B. alleges Mell Associates, Aero Care, and the Gulfstream entities breached their duty of care to her by allowing Mell to use their offices and, in the case of Aero Care, its airplanes, for criminal activity and tortious acts, providing him substantial assistance in the commission of those wrongs. B.B. claimed she was injured by their negligence in permitting

7

the physical and sexual abuse she suffered and seeks compensatory and punitive damages from them.

Finally, B.B. also included as a defendant Mell's wife, Kimberly Ruggles Mell, who divorced him following his 2018 arrest, alleging she conspired with her ex-husband to fraudulently transfer assets each owned, marital assets, assets owned by Aero Care, and assets held by the Bradley Mell 2012 Family Trust to others, including to the Steven Mell and Kimberly Mell Trusts, which B.B. alleged wrongfully benefited those trusts and the couple's three children as trust beneficiaries. B.B. claims the recipients of the allegedly wrongfully transferred assets, additional defendants Emily Mell, Eliza Mell, Kimberly Ruggles Mell as guardian of the couple's youngest child, minor W.M., the Steven Bradley Mell 2012 Family Trust, and the Kimberly Ruggles Mell 2012 Family Trust, have been unjustly enriched by those transfers, and she seeks to impose a constructive trust on all transferred assets whether in the hands of the transferee trusts or the couple's children. In her second amended complaint, B.B. also named Mountainside Securities, Inc. as a defendant, alleging it is a mere continuation or alter ego of its predecessor W.H. Mell, and thus may be liable for the obligations of W.H. Mell, including damages alleged by B.B. in this lawsuit.

8

Although Mell has yet to be deposed and B.B.'s deposition has not been completed, certain significant events have already occurred in the case. In January 2020, the trial court granted B.B.'s motion for a prejudgment writ of attachment against Mell's assets and income, including but not limited "to the buyout, future retirement distributions, and other money due him from Gulfstream" and Aero Care. B.B. v. Mell, 465 N.J. Super. 331, 335 (App. Div. 2020). The court subsequently amended the writ to allow Mell access to funds to pay the lawyers who were then defending him in this action. Id. at 336.

We granted B.B. leave to file an interlocutory appeal and reversed the order releasing money to Mell to pay his lawyers. Id. at 336-37. We found B.B. had a greater right to the attached funds than Mell or his counsel, "that nothing in the statutes or rules governing attachment actions creates an exception from attachment for a defendant's counsel fees, and that neither Mell nor [his counsel] . . . demonstrated an equitable right to the attached funds greater than B.B.'s right to the security provided by the attachment." Id. at 343.

The trial court also granted B.B. partial summary judgment on liability on her claims under the Child Sexual Abuse Act and the child exploitation

statute, as well as for assault and battery and both counts of invasion of privacy but denied summary judgment on her claim for false imprisonment.

The court subsequently denied a motion by Ruggles Mell for leave to file a third-party complaint against B.B.'s parents for contribution and indemnification arising out of their failure to alert her to Mell's prior sexual relationship with B.B.'s older sister, then a seventeen-year-old high school student, which they are alleged to have learned about in June 2016, a year before Mell had engaged in sex acts with B.B. Ruggles Mell alleged B.B.'s parents were aware of Mell's relationship with their older daughter, yet continued to thereafter socialize as a family with Mell and his family and accepted money and other things of value from Mell during the time that Mell was spending increasing amounts of time alone with B.B. Ruggles Mell asserted that had B.B.'s parents informed her in 2016 of the relationship between Mell and B.B.'s older sister or taken steps to shield B.B. from contact with Mell or at least limit the amount of time the two spent alone together, it is likely B.B. would not have been drawn into a relationship with Mell. Although denying Ruggles Mell's motion, the court ruled defendants were free to attempt to elicit further facts in discovery to support a contribution claim against B.B.'s parents.

10

Following the court's denial of her motion, Ruggles Mell subpoenaed B.B.'s parents and older sister for depositions. B.B. moved to quash those subpoenas and to limit the questioning of third parties "to the facts related to the counts of the amended complaint which have not yet been decided by the court on partial summary judgment."[2] The trial court denied the motion in December 2021.

In February 2022, B.B. filed a motion "setting the parameters of the deposition questioning of B.B. and non-party subpoenaed witnesses," arguing B.B.'s parents were immune to claims by defendants. B.B. contended defendants should not be permitted to blame B.B.'s parents for B.B.'s sexual assault by Mell, a convicted sex offender. Several defendants opposed the motion, contending parental immunity is not absolute, that the Child Sexual Abuse Act under which B.B. sued permits liability on the part of parents, and that questions of parental liability or immunity in this case cannot be resolved on less than a full factual record.

---

[2] Although B.B.'s counsel repeatedly notes B.B. has already obtained judgment for liability on several of her claims, the order for partial summary judgment is interlocutory and not a final judgment. It is not clear from the record whether Mell responded to the summary judgment motion.

A-2990-21

The trial court denied the motion, reasoning defendants, particularly those such as the Gulfstream entities and Aero Care that were sued for their negligence in failing to prevent Mell from sexually abusing B.B., were entitled to discover the facts of Mell's relationship with B.B.'s older sister and what B.B.'s parents knew of that relationship at the time they permitted fifteen- to sixteen-year-old B.B. to communicate and spend time alone with Mell. We denied B.B.'s motion for leave to appeal that order.

All of that serves as the backdrop of the dispute presented on this interlocutory appeal about the scope of questioning permitted defendants at B.B.'s deposition. The dispute arose when Mell's attorney attempted to question B.B. about the allegations of her complaint, specifically the "unwanted sexual acts" she alleged occurred on June 20, 2017. B.B. responded that "After many times of trying, [Mell] eventually did perform oral sex." Mell's attorney then asked, "Now, when he did that, was that consensual?" B.B.'s counsel directed her not to answer, contending the law was clear a minor under sixteen cannot consent to sex. Mell's attorney responded that was "a 2C concept" and he was not asking about statutory construction. He rephrased his question, asking "Did you say no to him when

A-2990-21

he performed oral sex on you?"  B.B.'s counsel again directed her not to

answer.

Following a renewed skirmish between counsel as to the appropriateness

of the question and the direction to the witness not to answer, Mell's attorney

again agreed to rephrase his question, leading to the following exchange:

> Q.  Ms. [B.B.], you allege in your complaint that on
> that particular night Brad Mell performed oral sex on
> you.  You're aware of that, right, you allege that?
>
> A.  Yes.
>
> Q.  Okay. When he performed oral sex on you, what
> did you do?
>
> A.  I asked him not to do it multiple times and —
>
> Q.  Okay.
>
> A.  — and then after the fourth or fifth time I gave in,
> I guess.
>
> B.B.'s counsel:  Let's stop. Hold on, [B.B.], he snuck
> the question in.  It went by me, sorry.  I should have
> got it.  When he said to you what did you do, I want to
> give you instruction.  You are not to testify at all
> about saying yes, saying no, resisting.  You are not to
> testify as to those issues with regard to any sex that
> occurred prior to the age of 16.  So he came back
> around the corner to try to end run me, and he got
> what he wanted.  Okay.
>
> [B.B.], it wasn't your fault, but from now on, when he
> tries to ask you what did you do, you're not going to

answer questions like that.  Because, again, he's trying to figure out and trying to get you to say you did resist, you didn't resist as if it's important for the case and it's not.  Any sexual contact, as you know, under 16 as a matter of law is deemed rape.

Now, let's go forward.  Do not answer any questions again if he says what did you do, how did you react, what was your feeling.  You're not going to talk about it.  You'll talk about your current treatment, you talk about how all of these sexual activities have had an effect on your life, which he'll get to sometime today.  But you are not to give any answers at all about your reactions to sexual contact under the age of 16 unless a judge on a full record orders you to do so.  So right now you're not going to do it.  Do not answer any question like that, because he's a pretty seasoned guy and he doesn't care about our objections.  He's going to try to get around it.  So don't let him do it again, all right.  All right.  Mr. [Mell's counsel], move forward.[3]

At that point, counsel paused the deposition to permit defense counsel to make a telephone application to the judge pursuant to Rule 4:14-4 for a ruling on the objection.  Although initially agreeing with plaintiff's counsel that "consent is irrelevant" because B.B. couldn't "consent by law," to sex before she was sixteen, and thus "questions involving consent . . . are improper

---

[3] On Mell's motion, the court subsequently entered an order limiting plaintiff's counsel to objections permitted under Rule 4:14-3(c) at the continuation of plaintiff's deposition, prohibiting plaintiff's counsel from interposing "speaking objections," and warning that any unprofessional conduct would be dealt with by the court.

14

because they don't lead anywhere," the judge further considered that defendants are "entitled to know the factual basis" for the complaint counsel drafted. Acknowledging he'd awarded B.B. summary judgment as to liability on several counts of her complaint, the judge found the questions "go to damages," and defendants are "certainly allowed" to probe the basis of the damages claim. Ultimately, the judge directed counsel to "[p]roceed with the deposition without the issues involving . . . consent" indicating counsel should make their record, and the court could decide the issue after full briefing.

Mell's counsel had not asked a dozen more questions before the attorneys were again at loggerheads over the scope of the questioning. After B.B. testified she had anal sex with Mell on four occasions, before she was sixteen and after, Mell's attorney asked, "After 16, when you had anal sex, what did you say to him during that sort of sexual encounter if anything?" B.B. responded that she'd told Mell she "didn't like it and that it really hurt." When counsel asked "when you told him you didn't like it and it hurt, why did you continue to do it," B.B.'s counsel interrupted, advising his client that Mell's attorney was "trying to get around the judge's ruling" and directed her to "[o]nly answer the question after the age of 16." When Mell's counsel attempted to clarify the witness's testimony by asking B.B. "Was it after the

A-2990-21

first time there was anal sex that you told Mell that you didn't like it," her counsel directed her not to answer, stating "So, [B.B.] let's make it clear. You are to talk about sex after the age of 16, but you're not to answer any questions about sex except what kind of sex occurred and the date. That's it."

Counsel again called the court for a ruling. After having the court reporter read back the questions and answers, the judge. acknowledging he "was trying to work this out in [his] own head," said he would sustain the objection to the second question "as phrased. However, the question of did you say anything to him in response is a fair question. That goes to damages." In response to a question from B.B.'s counsel about whether defense counsel could ask what B.B. said to Mell at fifteen, the judge replied, "As to 15, no. 16 and beyond, did she say anything in response, I think that's a fair question." Although the deposition resumed, the several defense counsel in attendance continued to clash with B.B.'s counsel over the questioning, and the deposition was adjourned uncompleted.

B.B. thereafter filed a motion "for an Order precluding any deposition questioning on the issue of consent and for a protective order," seeking to preclude defense counsel from asking her any questions about her consent to sexual activity with Mell occurring both before and after she turned sixteen.

16

The Kimberly Ruggles Mell Family Trust filed opposition and a cross-motion to preclude B.B. from offering testimony or evidence on the issue of consent if plaintiff's motion was granted.

At argument on the motion, B.B.'s counsel explained "what we're trying to do is avoid the defense counsel like we had in her first deposition, asking her questions that are extraordinarily painful for her to answer, not because she's the plaintiff in the case, but because as a matter of law she cannot consent to those things." Plaintiff's counsel argued questions related to consent to acts that occurred after B.B. turned sixteen are as irrelevant and improper as such questions about acts before B.B. turned sixteen because, under N.J.S.A. 2C:14-2(c)(3)(b), someone between the ages of sixteen and eighteen "cannot consent to . . . any sexual act" where the perpetrator "holds a supervisory or disciplinary position over the" minor.

Counsel for the Ruggles Mell Family Trust countered that Mell's alleged "supervisory and disciplinary authority" was a factual issue, and plaintiff was putting the "cart before the horse" by attempting to have that issue decided before discovery was complete. Counsel also argued it was not "practical, especially for discovery," to separate "consent" from facts about physical conduct or force.

17

Trust counsel contended B.B. "is going to get on the stand and she's going to make an argument about damages, and from what I understand, they're going to be asking for a lot of damages." Anticipating that B.B. would not limit her testimony at trial to the dates on which she had engaged in sex acts with Mell to establish her damages, counsel asserted that "what gets somebody from a one million award to a ten million award" is "[e]xactly what happened, the story" and things like "physical force," whether she told Mell "to stop," will bear on whether she can "get a higher damages award." Trust counsel contended defendants, particularly those that did not have sexual interactions with B.B., "can't be expected to go into this trial blindfolded without being able to explore" exactly what happened between B.B. and Mell.

The judge denied B.B.'s motion for a protective order "on the question of consent." While declaring "the damages issue and the consent issue are very, very close calls," the judge held "consent is different from damages." Referencing his prior ruling forbidding questions about B.B.'s consent before her sixteenth birthday, the court explained "[t]his is discovery in a civil case and 2C is a criminal statute." Observing that whether Mell had supervisory authority over plaintiff is "still up in the air," the judge explained plaintiff is going to "testify to damages that happened when she was fifteen years old.

A-2990-21

And if . . . that borders into whether in fact she gave consent or not," defendants are entitled to ask "those questions." The judge continued, "[i]f the plaintiff's gonna get on the stand and testify to something, "no matter whether — whether it is consent or not, counsel's entitled to ask those questions. That's what full and fair discovery in a civil case is about."

Although predicting "certain issues with regard to whether [B.B.] said no or . . . fought him back" are "probably not admissible at trial," the judge ruled the "defense is entitled to at least ask the question to get an answer." Ultimately, the judge concluded "[p]laintiff brought this case, brought these allegations," and defendants are "entitled to ask reasonable questions, based upon . . . the factual allegations in the complaint."

Following argument, the judge entered an order "preclud[ing] deposition questioning on the issue of consent as to facts that occurred before . . . plaintiff was 16 years old" while noting "[t]his order does not limit questions on any and all damages that plaintiff is claiming in this case and is expected to testify to at the time of trial." We granted plaintiff's motion for leave to appeal to clarify the scope of discovery in this protracted and contentious case.

Our standard of review here is clear. We "defer to a trial judge's discovery rulings absent an abuse of discretion or a judge's misunderstanding

19

or misapplication of the law."  Cap. Health Sys. v. Horizon Healthcare Servs., 230 N.J. 73, 79-80 (2017).  Our Supreme Court has instructed, however, that in applying that standard, "appellate courts must start from the premise that discovery rules 'are to be construed liberally in favor of broad pretrial discovery.'"  Id. at 80 (quoting Payton v. N.J. Tpk. Auth., 148 N.J. 524, 535 (1997)).  The Court commands we start there because "[o]ur court system has long been committed to the view that essential justice is better achieved when there has been full disclosure so that the parties [may become] conversant with all the available facts."  Ibid. (quoting Jenkins v. Rainner, 69 N.J. 50 (1976)).

That commitment is reflected in Rule 4:10-2(a), which provides:

> [u]nless otherwise limited by order of the court in accordance with [the court] rules, . . . [p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . .

The Rule expressly provides "[i]t is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence . . . ."  R. 4:10-2(a).  Relevancy for the purpose of this rule is synonymous with relevancy under N.J.R.E. 401, that is, "[e]vidence is relevant if it has a

'tendency in reason to prove or disprove any fact of consequence to the determination of the action.'" K.S. v. ABC Pro. Corp., 330 N.J. Super. 288, 291 (App. Div. 2000) (quoting Payton, 148 N.J. at 535).

Thus, to resolve the parties' discovery dispute we need to first answer the question of whether B.B.'s alleged consent to sexual contact with Mell is relevant to her claims or to the defense of any one of defendants. If B.B's consent or acquiescence is relevant, we then consider whether there are grounds for a protective order preventing or limiting the discovery.[4]

_____

[4] Contrary to our concurring colleague's view, our analysis does not in any way address what evidence may be admissible at trial. The muddle in the trial court resulted from plaintiff's insistence that the criminal age of consent dictated the scope of discovery in this civil case, first arguing that would be sixteen and then that it could be eighteen in light of Mell's alleged supervisory authority over B.B, see N.J.S.A. 2C: 14-2(c)(3)(b).

The trial court's failure to address that issue head on led to its ruling "preclud[ing] deposition questioning on the issue of consent as to facts that occurred before . . . plaintiff was 16 years old" while allowing "questions on any and all damages that plaintiff is claiming in this case [including those flowing from acts that occurred before her sixteenth birthday] and is expected to testify to at the time of trial." In our view, that ruling provided the parties with too little guidance about the scope of discovery, and would, in any event, prove unworkable in practice, leading to more depositions like the first one.

All we've done is establish the proper scope of discovery — not the admissibility of evidence at trial — by conducting the analysis Rule 4:10-2(a) demands, that is to determine whether the questioning "is relevant to the subject matter involved in the pending action, whether it relates to the claim or

Rule 4:10-3 governing protective orders, authorizes a court to "make any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Such an order may provide, among other things, that "discovery may not be had," R. 4:10-3(a), or "[t]hat certain matters not be inquired into, or that the scope of discovery be limited to certain matters," R. 4:10-3(d). "The limiting factors underlying Rule 4:10-3 must be weighed against the presumptively broad scope of discovery authorized in Rule 4:10-2 and other discovery provisions in our Rules of Court." Serrano v. Underground Utils. Corp., 407 N.J. Super. 253, 267 (App. Div. 2009). "[T]he movant bears the burden of persuading the court that good cause exists for issuing the protective order." Kerr v. Able Sanitary & Env't Servs., Inc., 295 N.J. Super. 147, 155 (App. Div. 1996).

B.B. claims the issue here is how "to sensitively conduct discovery" in childhood sexual abuse cases "without requiring the victim to relive devastating memories of the abuse through unnecessary questions around

---

the defense of the party seeking the discovery or to the claim or defense of any other party" to the action. Having conducted that analysis in accordance with well-established law, we conclude the issue of the extent of B.B.'s active participation in sex acts with Mell both before and after the criminal age of consent is relevant to the subject matter of the suit, in the same way his use of force or coercion in engaging in those acts is relevant, and thus properly within the scope of discovery.

consent when the defendant has already pleaded guilty to statutory crimes where consent could not be given as a matter of law." She contends "the trial court erred by failing to protect a sexual assault victim" from questions "blaming her for the acts of the convicted sex offender."

B.B. maintains the court correctly ruled N.J.S.A. 2C:14-2(c)(4) "barred questions at plaintiff's deposition relative to her consent to sexual acts . . . at age fifteen" and erred by failing to extend that reasoning to sexual acts that occurred when plaintiff was sixteen pursuant to subsection (c)(3)(b) of the same statute. She contends the court's ruling violates public policy, by allowing "defendants, including a convicted sex offender, to apportion liability to the victim," and that the court should not have permitted defendants to question her at her deposition regarding her consent to sexual acts with Mell once she turned sixteen without having "held a hearing on the issue of Mell's supervisory or disciplinary power" over her.

Defendants counter that the trial court appropriately recognized their right to discovery as to the allegations of B.B.'s complaint. They maintain N.J.S.A. 2C:14-2(c)(3)(b) cannot bar their questioning B.B. about her putative consent to sex acts at age sixteen because "it requires determination of an ultimate issue of fact" — whether Mel had disciplinary or supervisory

authority of any nature over B.B. — "that the court cannot make at this juncture."

While B.B. asserts the trial court "ignored the long-established New Jersey case law of applying criminal statutes to civil actions," she has not brought to our attention any case where our courts have precluded discovery in a civil action based on a criminal statute, as she asks us to do here. Although our courts have oftentimes looked to criminal statutes as an expression of the State's public policy in defining a common law duty, the Court has long made clear that "'[d]efining the scope of tort liability has traditionally been . . . the responsibility of the courts." Estate of Narleski v. Gomes, 244 N.J. 199, 215 (2020) (quoting Kelly v. Gwinnell, 96 N.J. 538, 555 (1984)).

In Narleski, for example, the case B.B. relies on, the Court was quick to note the criminal statutes making it illegal for one to supply an underage person with any amount of alcohol or make their property available for the underage consumption of it "create penal sanctions, not tort liability standards." Id. at 218. The Court did not adopt the criminal law standard in announcing the common law duty imposed on eighteen- to twenty-one-year-olds to a third-party drunk driving victim injured or killed by a guest served alcohol at an underaged person's home. Although acknowledging "only a

24

person over the age of twenty-one may 'legally' provide alcoholic beverages to another," the Court limited the tort duty of underaged adults to simply refraining from providing "alcohol to visibly intoxicated underage guests, who are likely to drive," deeming it "the logical extension of our common law jurisprudence and legislative enactments aimed at combatting drunk driving and providing fair compensation for its victims." Id. at 216, 225-26, 228.

"Tort standards and criminal statutes are not necessarily co-extensive and sometimes advance similar yet different goals." Id. at 224. The violation of a criminal statute in New Jersey is generally only "'evidence' of the breach of a duty of care." Id. at 218 n.10 (citing Alloway v. Bradlees, Inc., 157 N.J. 221, 236 (1999) (noting "the well-established principle that the violation of a legislated standard of conduct may be regarded as evidence of negligence if the plaintiff was a member of the class for whose benefit the standard was established")); see also Labega v. Joshi, 470 N.J. Super. 472, 489 (App. Div. 2022) (discussing narrowness of negligence per se doctrine in New Jersey).

Here, while the criminal law makes sixteen the age of consent in New Jersey, N.J.S.A. 2C:14-2(c)(4) ("[a]n actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person" where "[t]he victim is at least 13 but less than 16 years old and the actor is at least four

years older than the victim"), Mell did not plead guilty to that offense. Mell, who it's important to remember is only one of several defendants in this case, pleaded guilty to third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), which makes it a crime for any person to engage "in sexual conduct which would impair or debauch the morals of the child" under the age of eighteen.

Judge Posner, writing for the Seventh Circuit Court of Appeals, has observed "[t]he age of consent fixed by a state represents a legislative judgment about the maturity of girls [and boys] in matters of sex." Beul v. ASSE Int'l, 233 F.3d 441, 450 (7th Cir. 2000). In Beul, the plaintiff, a sixteen-year-old exchange student, engaged in several months of sexual activity with the forty-year-old husband and father of the host family with which she'd been placed by the defendant, a nonprofit corporation that operated an international student exchange program. Id. at 446. Although that relationship began with Beul's rape, and her abuser had a gun and threatened to "kill himself if she told anyone what they were doing together," Beul eventually decided she was in love with her abuser and, after he separated from his wife, considered herself engaged to marry him. Ibid.

Despite Beul's efforts to conceal the relationship, it was eventually revealed, and her abuser killed himself, apparently because he feared being jailed for having sex with a sixteen-year-old. Ibid. It was undisputed the relationship and her abuser's suicide had "inflicted serious psychological harm" on Beul. Ibid.

After having been instructed "that the law of Wisconsin does not allow a child under the age of 18 to consent to an act of intercourse," the jury returned a verdict for Beul against the nonprofit corporation of $1.1 million for its negligence, assessing Beul's comparative fault at forty-one percent. Id. at 450. Addressing the questions of "should the jury have been told what the age of consent is in Wisconsin and, if so, was the information conveyed to the jury in the right way?" Judge Posner answered the first question in the affirmative. Ibid.

Observing that "[e]ighteen was a pretty high age of consent by today's standards," the judge deemed it "nonetheless a reminder that teenage children are not considered fully responsible in sexual matters," and it was thus "relevant to the jury's consideration of [Beul's] share of responsibility for the disaster" that befell her. Ibid. The court held "[i]t would have been error," however, to have instructed the jurors that the plaintiff's comparative fault had

27

to be assessed at zero because she was below the age of consent. Id. at 450-51.

Judge Posner explained "[t]hat would have given too much force to the criminal statute in this civil case, for the statute cannot be considered a legislative judgment that minors are utterly incapable of avoiding becoming ensnared in sexual relationships." Id. at 451.

As to the second question of whether the age of consent had been conveyed to the jurors "in the right way," Judge Posner wrote on behalf of the panel that "[i]t would have been better . . . if the jury had been told how it should take the age of consent into account in their deliberations." Ibid. (emphasis in original). The circuit court was of the view that jurors should be advised of the criminal age of consent, but not left "to tease out the relation between the age-of-consent instruction and the comparative-fault instruction," on their own.[5] Ibid. The court maintained the jurors "should have been told that in deciding how much responsibility to assign to [Beul] for the events that gave rise to the harm for which she was suing," they could consider the state's

---

[5] The court deemed the error harmless, however, describing itself "surprised that the jury assigned so large a responsibility to this young foreign girl virtually abandoned by the agency that was standing in for her parents. The jury verdict was rather favorable to the defendant than otherwise." Beul, 233 F.3d at 451.

A-2990-21

judgment that minors below the age of consent "should be protected by the criminal law from sexual activity even if they agree to it."  Ibid.

Judge Posner's analysis in Beul is particularly instructive here for two reasons.  First, notwithstanding B.B.'s claim the trial court should have applied the criminal consent statute to find the facts concerning her putative consent or acquiescence to the sexual encounters with Mell irrelevant and thus outside the scope of discovery, this isn't a case in which the court is asked to consider whether defendant's alleged violation of a criminal statute should give rise to a common law duty of care, as in Narleski.  As our Supreme Court has noted, "[t]he Legislature has dealt comprehensively with the subject of child abuse and has enacted a plethora of statutes designed to prevent the sexual abuse of children," J.S. v. R.T.H., 155 N.J. 330, 343-44 n.3 (1998), including the Child Sexual Abuse Act under which plaintiff sues, which created a statutory cause of action for child sexual abuse, defined as "an act of sexual contact or sexual penetration between a child under the age of 18 years and an adult," N.J.S.A. 2A:61B-1(a).

More important, the Legislature chose not to incorporate the criminal consent standard into the Child Sexual Abuse Act.  Instead, the Act extends relief to any child under the age of eighteen having sexual contact with an

29

adult, only permitting the trial testimony of a plaintiff sixteen-years-old and younger to be taken on closed circuit television, if the court finds a substantial likelihood the plaintiff "would suffer severe emotional or mental distress if required to testify in open court." N.J.S.A. 2A:61B-1(a)(1) and -(e)(1), (2); A.B. v. Y.Z., 184 N.J. 599, 601 (2005) (holding it was error to permit the victim, sixteen at the time of the abuse but twenty-one at the time he testified in the civil suit "to testify by closed circuit television outside of the presence of defendant").

A plaintiff establishing a violation of the statute is entitled to an award of statutory damages of $10,000 with no showing of harm, "or actual damages, whichever is greater." N.J.S.A. 2A:61B-1(h). Actual damages include compensatory damages, including but not limited to "pain and suffering, medical expenses, emotional trauma, diminished childhood, diminished enjoyment of life, costs of counseling, and lost wages," as well as punitive damages and reasonable attorney's fees. Ibid. Far from any Legislative judgment that minors are incapable of avoiding sexual entanglements with adults, the Child Sexual Abuse Act more readily suggests the Legislature's awareness of the dispiriting regularity of minors, both above and below the legal age of consent, becoming ensnared in such relationships, the varying

degrees of harm they can suffer as a result, and its desire to provide them a statutory tort remedy against those persons who would take advantage of their youth and those who would enable them to do so.  See Hardwicke v. Am. Boychoir Sch., 188 N.J. 69, 84-90 (2006).

Second, Judge Posner's approach in Beul, a negligence case, as to how jurors should take the age of consent into account in assessing a minor plaintiff's comparative fault for the events giving rise to the harm sued for, is particularly useful here because our law requires assessment of a plaintiff's comparative fault even in cases, such as this one, alleging intentional torts.[6]

---

[6] Several years after writing Beul, Judge Posner had occasion to consider the affect of an age of consent statute in a Title VII case in which a sixteen-year-old part-time employee in an ice cream shop alleged she was sexually harassed by her twenty-five-year-old supervisor, culminating in their having consensual sex, for which he was convicted of statutory rape. Doe v. Oberweis Dairy, 456 F.3d 704, 707 (7th Cir. 2006).  Although acknowledging that consent to sexual relations with a supervisor was not a defense to a sexual harassment claim by a plaintiff who was underage when the alleged harassment occurred, Judge Posner concluded that "does not mean that the conduct of the plaintiff can never be used to reduce the defendant's damages in such a case." Id. at 714.

Because "the plaintiff was an active participant in, rather than a passive victim of, the principal discriminatory act of which she complains — the act of sexual intercourse with [her supervisor]," the court determined that at the damages stage, "the defendant — who is not [the supervisor], but [the supervisor's] employer — should be permitted to put [the supervisor's] conduct in perspective." Id. at 715.  The judge reasoned that if the proofs showed the plaintiff was attempting to conceal the relationship, thereby facilitating the

A-2990-21

See <u>Blazovic v. Andrich</u>, 124 N.J. 90, 107 (1991) (holding "consistent with the evolution of comparative negligence and joint-tortfeasor liability in this state, . . . responsibility for a plaintiff's claimed injury is to be apportioned according to each party's relative degree of fault, including the fault attributable to an intentional tortfeasor").

Neither B.B.'s minority, <u>see</u> <u>C.J.R. v. G.A.</u>, 438 N.J. Super. 387, 397 (App. Div. 2014) (noting for children over seven "our law applies a fact-sensitive and context-specific approach, examining the age and other characteristics" of the minor), nor Mell's criminal convictions deprives defendants of the benefit of the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, <u>see</u> <u>Bonpua v. Fagan</u>, 253 N.J. Super. 475, 478 (App. Div. 1992) (holding Comparative Negligence Act applies notwithstanding the defendant's intentional wrongdoing resulted in his conviction of a criminal offense), as to any of B.B.'s claims. As we noted in <u>Bonpua</u>, even if one assumed "some intentional wrongdoing may be so offensive that the tortfeasor should not be

---

supervisor's misconduct, the employer might be able to demonstrate the harm the plaintiff suffered from its violation of Title VII was minimal in comparison with that of the harm caused by the supervisor. <u>Ibid.</u> Judge Posner concluded "[t]hat would be a straightforward application of the principle that a plaintiff may recover from a defendant only those compensatory damages that can fairly be traced to the defendant's conduct." <u>Ibid.</u>

allowed to assert the plaintiff's contributory fault, <u>cf.</u> Jake Dear & Steven E. Zipperstein, <u>Comparative Fault and Intentional Torts: Doctrinal Barriers and Policy Considerations</u>, 24 <u>Santa Clara L.Rev.</u> 1, 18-20 (1984)," New Jersey law requires that determination to turn on the fact-finder's assessment of the parties' conduct rather than on the defendant having been convicted of a criminal offense.[7] <u>Bonpua</u>, 253 N.J. Super. at 479.

Thus, a jury finding liability on the part of a defendant in an action brought under the Child Sexual Abuse Act for actual damages is required, if there are sufficient facts in the record to permit a reasonable jury to conclude the plaintiff's conduct contributed to the injuries she has allegedly sustained, to assess whether the plaintiff was also negligent, and, if so, whether plaintiff's negligence was a proximate cause of the harm suffered. <u>Cf.</u> <u>Steele v. Kerrigan</u>, 148 N.J. 1, 34 (1997) (holding in case of intentional assault by underage patron illegally served alcohol, that "the jury should be instructed to apportion fault on the basis of all the evidence, including evidence of the

---

[7] As the Court explained in <u>Blazovic</u>, "[b]ecause punitive damages are designed to punish the wrongdoer, and not to compensate the injured party, they can neither be apportioned nor subject to contribution among joint tortfeasors. That principle will accomplish the goal of equitably dividing liability for a plaintiff's compensatory damages, while keeping intact the policy of punishing wanton or intentional acts." 124 N.J. 90, 108 (1991).

tavern's negligence in both commencing and continuing to serve the minor, evidence of the minor's fault in deciding to consume the alcohol, evidence concerning the minor's actual degree of intoxication and his capacity to determine whether to refrain from or initiate assaultive behavior, and any evidence of the minor's predisposition to violence or other factors contributing to the incident").

The jury is, of course, free to find a minor plaintiff harmed by consensual sexual acts with an adult free from any fault and will often likely do so, particularly as a hallmark of such acts is the efforts the abuser makes to "groom" or build "trust with a child or an adult around the child in an effort to gain access to the child, make the child a cooperative participant in the abuse, and reduce the chance that the abuse is detected or disclosed." People v. Vara, 68 N.E.3d 1018, 1025 (Ill. App (2d) 2016); see also Daniel Pollack and Andrea MacIver, Understanding Sexual Abuse in Child Abuse Cases, Child L. Prac. Today, Nov. 2015 (citing U.S. Department of Justice, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) Program).

Depending on the facts, a jury could conclude the minor, even one over the age of consent, was in no position to comprehend the immediate and

longer-term risks of such a relationship even if he or she was a voluntary participant, and find the adult, who knew or should have realized the risks, entirely responsible for any "consent" seduced, coerced or cajoled through force, fear, fraud or undue influence. The same is true of intentional torts such as assault and battery or the intentional infliction of emotional distress, typical common law claims for child sexual abuse.

From this discussion, we think it plain that plaintiff's conduct, including whether she "consented" or actively participated in sexual acts with Mell whether she was fifteen or sixteen is relevant, at this stage of the proceeding, to liability on all of her common law claims as well as to all of her damages claims. See Gennari v. Weichert Co. Realtors, 148 N.J. 582, 608-609 (1997) (noting the Comparative Negligence Act encompasses negligence, as well as strict liability, intentional torts, and wanton conduct because "[c]ompensation should depend not on the description of the action, but on the nature of the injury and the requested remedies"). Even if B.B. could eventually establish that Mell should be precluded from apportioning liability to her, not because of any criminal statute, but, for instance, because his civil "duty of care encompasse[d] the obligation to prevent the specific misconduct that caused [her] injury," see, e.g., Martin v. Prime Hosp. Corp., 345 N.J. Super. 278, 287

35

(App. Div. 2001), she could not do so on less than a full record, including, for example, whether she was aware of an alleged prior relationship between Mell and her older sister, which would go to her knowledge of the risk.  See id. at 289-90 (discussing exceptions to the general rule of apportionment and noting in that case the plaintiff "had 'some responsibility for her own well-being, even if it was to exercise only that degree of care that a person in her condition was capable of exercising'" (quoting Cowan v. Doering, 111 N.J. 451, 469 (1988) (Clifford, J. dissenting))).

B.B. has also sued several entities in addition to Mell, including W.H. Mell, the Gulfstream entities, and Aero Care for compensatory and punitive damages, claiming they breached their duty of care to her by allowing Mell to use their facilities to accomplish his tortious acts, providing him substantial assistance in the commission of those wrongs.  She has offered no argument as to how she might avoid apportionment of fault with those entities, which were not participants in the relationship between B.B. and Mell, and she has sued only on a negligence theory.

Finally, B.B. has not put forth any basis for a protective order preventing or limiting the discovery.  See Cap. Health Sys., Inc., 230 N.J. at 80 (noting "to overcome the presumption in favor of discoverability, a party must show

A-2990-21

'good cause' for withholding relevant discovery").  Although we recognize, of course, "[t]he protection of children from undue trauma when testifying is an important public policy goal[,]" State v. T.E., 342 N.J. Super. 14, 30 (App. Div. 2001), here, however, it is the Legislature that has drawn the line, permitting only children under sixteen to give trial testimony via closed circuit television and only if the court finds, after a hearing in camera, "that there is a substantial likelihood that the victim would suffer severe emotional or mental distress if required to testify in open court," N.J.S.A. 2A:61B-1(e)(1),(2); A.B., 184 N.J. at 601 (2005).

Defendants are entitled to full factual discovery on all issues relevant to the claims put forth in B.B.'s complaint and any available defenses, including the nature and extent of her sexual activity with Mell, without limitation under Rule 4:10-2.  As our Supreme Court has held on too many occasions to count, "[o]ur court system has long been committed to the view that essential justice is better achieved when there has been full disclosure so that the parties are conversant with all the available facts," Jenkins, 69 N.J. at 56, and, to serve that purpose, the Court has further instructed that our discovery rules "are to be construed liberally in favor of broad pretrial discovery," Payton, 148 N.J. at 535.

In reaching our conclusion, we recognize, of course, the sensitive nature of the questioning at issue and remain committed to the belief that no witness — particularly one suing under the Child Sexual Abuse Act — should be unnecessarily embarrassed by questions posed at a deposition. The trial court has an arsenal of tools and sanctions at its disposal to ensure the deposition of a witness is conducted fairly and professionally, and we are confident it will not hesitate to employ them as necessary. But our Rules and basic fairness dictate that a plaintiff cannot limit the scope of discovery by barring the defendants from asking legitimate questions about the facts the plaintiff has pled in her complaint.

We affirm the trial court's order denying plaintiff's request to bar defendants from asking questions at deposition relating to her consent to sexual activity, modified to remove the age restriction imposed therein.

Affirmed as modified.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

38
A-2990-21

NATALI, J.A.D., concurring.

Having received the majority's opinion, I write separately to detail the bases for my concurrence and to state I cannot join in the majority's opinion except as expressly noted.

First, I agree, based on the specific allegations of plaintiff's complaint and her attendant claims for punitive and compensatory damage, that appropriate discovery into those allegations and claims is proper. I do so because our Supreme Court has said, time and again, that "[o]ur court system has long been committed to the view that essential justice is better achieved when there has been full disclosure so that the parties [may become] conversant with all the available facts," Capital Health Sys. v. Horizon Healthcare Servs., 230 N.J. 73, 80 (2017) (quoting Jenkins v. Rainner, 69 N.J. 50, 56 (1976)), and, to serve that purpose, the Court has further instructed that our discovery rules "are to be construed liberally in favor of broad pretrial discovery," ibid. (quoting Payton v. N.J. Tpk. Auth., 148 N.J. 524, 535 (1997)). But I cannot, and do not, join in the rest of the opinion's analysis for the following reasons.

There is much in the majority's opinion that purports to determine whether or how plaintiff's answers to such questions may be used at trial. I agree, as

A-2990-21

plaintiff's counsel noted at oral argument, that defendants may inquire about those factual allegations as well as to damages. On this point all parties agree, discovery is broad; in my view, plaintiff — who is now an adult — may be asked about her claims to the extent those questions may be relevant or might lead to the discovery of relevant evidence.[8] How or whether the defense may use her words or acts when she was a minor <u>at trial</u> poses other and different questions not presently before us.

Second, I agree with the majority's penultimate paragraph in which they recognize the "sensitive nature of the questioning at issue" and they "remain committed to the belief that no witness — particularly one suing under the Child Sexual Abuse Act — should be unnecessarily embarrassed by questions posed at a deposition." But, the approach taken by the majority, in my view, may have the unintended consequence of denying those very protections. On this point, let us not lose sight of the facts underlying this appeal. Plaintiff has alleged, in excruciating detail, that Mell — who pled guilty to serious charges — engaged in criminal conduct by, among other aberrant behavior, grooming her and sexually assaulting her when she was but a fifteen-year old child.

---

[8] My view might be different if plaintiff were still a minor.

A-2990-21

While defendants are certainly entitled to inquire about those facts reasonably, discovery is not a free for all. And I am convinced that the majority's legal conclusion that "plaintiff's conduct, including, whether she 'consented' or actively participated in a sexual relationship with Mell whether she was fifteen or sixteen is relevant, at this stage of the proceeding, to liability on all of her common law claims as well as to all of her damages claims",[9] is unnecessary to resolve whether the trial court properly exercised its considerable discretion.

I also believe those comments may actually result in an abuse of the discovery process, particularly in a case involving a fifteen and sixteen-year old abused by Mell, as alleged. My concerns are based not on an imaginary parade of horribles, but on the series of questions that led to this appeal. As detailed in the majority's opinion, plaintiff's counsel did not preclude questioning as to what effect Mell's conduct and sexual assaults had on her emotional well-being, or how it harmed her personally, educationally or professionally. Instead, after an

---

[9] I expressly reject and do not support any language in the majority's opinion that characterizes plaintiff's allegations as if she "partipat[ed]" in Mell's sexual assaults or describes her claims in any other way than how plaintiff detailed them in her complaint. I similarly reject any comments that suggest discovery is necessary as it may be relevant to any hypothetical "fault" that the majority believes may, at trial, be ascribed to plaintiff. The current record provides no support for such speculation.

A-2990-21

earlier teleconference with the court, defendants proceeded to ask plaintiff, over four times, about anal sex, and what she said to Mell. When plaintiff responded she didn't like it and it "really hurt", and counsel continued in the manner described by the majority, plaintiff's counsel objected.[10] How will the court realistically be able to enter a protective order if, hypothetically, defendants, on remand, ask cumulative, harassing and oppressive questions of B.B., in light of the language in the majority's decision detailed above?

I would permit discovery as to the factual allegations of the complaint and damages and say no more. As the trial court noted, certain questions that appear to involve "consent" may address damages and are likely appropriate. Other questions, that address the factual allegations but are repetitive and harassing could be determined by the trial judge to be beyond the scope of proper discovery or warranting a protective order. The trial court is in the best position to make those rulings which are at their core specific. In my view, they cannot be decided in the abstract and without a full record and as the majority correctly notes, the trial court has an "arsenal of tools and sanctions at its disposal to ensure the deposition of a witness is conducted fairly and professionally".

---

[10] As my colleague recounts, the court addressed the issue of plaintiff's counsel's improper speaking objections. If anything, that evidences the court 's ability to control the discovery process.

A-2990-21

Finally, there is another reason I would let the trial court resolve any discovery disputes on a more detailed record and that is because I believe judicial restraint compels such an approach. I choose not to predict what questions will be asked and in what context. Nor do I prefer to suggest how or whether such information may be used at trial. We can understand and appreciate whether this information should be given to the factfinder only once it is offered at trial when its relevance, if any, can be appreciated in the context of the other evidence. At present, we neither know the answers to any future questions nor how any party may attempt to use those answers — if at all — at trial; for these reasons, the majority's expansive views are precipitous.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2990-21